ROWLAND MARCUS ANDRADE
9414 Plaza Point Drive
Missouri City, Texas 77459   USA

In Pro Se

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ONE PARCEL OF REAL PROPERTY LOCATED AT 9414 PLAZA POINT DRIVE, MISSOURI CITY, TEXAS 77459,<br><br>Defendant.<br><br>ROWLAND MARCUS ANDRADE,<br><br>Claimant.<br><br>SOLMAZ ANDRADE,<br><br>Claimant.<br><br>WILMINGTON SAVINGS FUND SOCIETY, FSB as trustee for IRP FUND II TRUST 2A,<br><br>Claimant. | Case No. 3:20-cv-2013-VC<br><br>**DECLARATION OF ROWLAND MARCUS ANDRADE IN OPPOSITION TO PLAINTIFF UNITED STATES' MOTION TO STAY**<br><br>*Filed concurrently with CLAIMANT ROWLAND MARCUS ANDRADE'S OPPOSITION TO PLAINTIFF UNITED STATES' MOTION TO STAY*<br><br>Judge:   Hon. Vince Chhabria<br><br>Trial Date:            None Set<br><br>Hearing Date: July 1, 2020 at 1:30 p.m. |

**DECLARATION OF ROWLAND MARCUS ANDRADE**

I, Rowland Marcus Andrade, declare as follows:

1.  I am a party in the above-entitled action. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed

and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

**B.     My Business Relationships, or Lack Thereof, With "J.D." and "VICTIM ONE."**

2.     In 2017, I had a brief business relationship with an individual named Japheth Dillman, whom I believe to be the "J.D." identified in the Complaint. Dillman is the only individual I know with the initials "JD" who took actions such as those described in the Complaint. Dillman was introduced to me by famous lobbyist and convicted felon Jack Abramoff, who came to me offering to help develop AML Bitcoin partnerships with government officials he knew through his lobbying activities.

3.     As part of his assistance, Abramoff encouraged me to hire Dillman, one of his associates, as a "Chief Strategy Officer." NAC proceeded to hire Dillman as its Chief Strategy Officer in a letter dated September 24, 2017. Dillman's duties were not to sell AML Bitcoin Tokens, but to generate publicity and marketing strategies including a developing partnership with the Port of San Francisco, foreign governments, and Silicon Valley tech companies. A true and correct copy of Dillman's employment agreement with NAC is attached hereto as Exhibit 1.

4.     Dillman never performed the duties required of him as Chief Strategy Officer, and I ultimately terminated his involvement with the project in December 2018.

5.     In January 2018, a company named Block Bits Capital, LLC ("Block Bits Capital") owned by Dillman, Abramoff, and their associates, purchased AML Bitcoin Tokens directly from NAC as part of the initial sale (i.e., the ICO) of AML Bitcoin Tokens. Distribution statements showing purchases of AML Bitcoin Tokens by Block Bits Capital are attached hereto as Exhibit 2.

6.     I was never part of Block Bits Capital or Block Bits AML Holdings, the company to which Benjamin Boyer—whom I believe to be the "VICTIM ONE" identified in the Complaint—paid money in January 2018.

7.     Distribution statements I obtained later from Block Bits AML Holdings indicate that the transactions referred to in the Complaint were payments from Boyer to Block Bits AML Holldings, not to NAC. A true and correct copy of those distribution statements, which match the dollar amounts and dates of the transactions listed in the Complaint, is attached hereto as Exhibit

3. The correspondence between these transactions and the Complaint is the basis for my belief that "VICTIM ONE" is Boyer.

8. Around late November 2018, I found out that Dillman and his partner David Mata were allegedly making misrepresentations to people when brokering the sale of AML Bitcoin Tokens. When I learned of this issue in late 2018, NAC's compliance attorney Chris Ray reached out to Boyer and Dillman and Mata. Ray sent Boyer an email asking him to contact Ray. My staff then followed up on that email to inform Boyer that Ray's job was to ensure that all the information he received from his client was true and accurate. A true and correct copy of those emails is attached hereto as Exhibit 4.

9. Shortly thereafter, Mata, now representing himself as the Managing Director of Block Bits Capital, informed me that Boyer had already sold his AML Bitcoin Tokens to Dillman, and so would likely not respond to me or Ray. A true and correct copy of an affidavit from Chris Ray regarding these events is attached hereto as Exhibit 5.

10. As a result of the information I had learned from Mata and Ray indicating that Mata and Dillman may have made false representations to Boyer, I tried to get ahold of Boyer to offer him a full refund of his direct purchases in December 2018 and January 2019, and informed Mata and Dillman that I would no longer do any business with Block Bits. A true and correct copy of my January 10, 2019 email to Mata and Dillman is attached hereto as Exhibit 6.

**B.     Development of the AML Bitcoin Technology.**

11. I began developing cryptocurrency with anti-money-laundering ("AML") security features in 2012, and formed the company NAC Foundation, LLC ("NAC") in 2014.

12. My technological innovations primarily involved cryptocurrencies with biometric identity verification features to prevent anonymous accounts from being used to launder money or to use cryptocurrency for other illegal purposes. We even use transaction monitoring software.

13. Using all my technology, I developed the Aten Coin, a digital currency designed to be compliant with anti-money-laundering and anti-terrorist regulations and to be theft-resistant. NAC officially launched the Aten Coin publicly on September 21, 2015, selling about nine million Aten Coins.

14. I have filed applications for patents on my technology in many countries, the first of which was a European patent application filed on March 3, 2015. I have since obtained seven United States Patents on my technology, U.S. Patents Nos. 9,985,964, 10,116,657, 10,182,051, 10,298,571, 10,298,572, 10,389,713, and 10,484,178, with other applications still pending in the U.S., along with many related issued patents and pending patent applications in other countries. The earliest U.S. Patent has a priority date in March 2016.

15. In advance of an initial coin offering ("ICO") of AML Bitcoin Tokens in October 2017, NAC released a white paper explaining in detail the technology and business plan behind AML Bitcoin, and its improvements over the predecessor Aten Coin. A true and correct copy of that white paper, which is publicly available from the NAC website at https://amlbitcoin.com/white-paper/, is attached hereto as Exhibit 7.

16. AML Bitcoin Tokens were a cryptocurrency designed as a placeholder for the planned AML Bitcoin that lacked the biometric security features intended for AML Bitcoin. They were created to allow customers to begin using NAC's cryptocurrency products while AML Bitcoin was in development. A "Frequently Asked Questions" page available on the NAC website at https://amlbitcoin.com/faq/ explains the difference between AML Bitcoin Tokens and AML Bitcoin. A true and correct copy of that web page is attached hereto as Exhibit 8.

17. As part of the October 2017 ICO, NAC issued and sold millions of AML Bitcoin Tokens between October 2017 and February 2018, at prices of around $1.00 to $1.50 per AML Bitcoin Token.

18. I continued developing AML Bitcoin technology throughout 2018 and 2019, making steady progress. I never promised any investor in January 2018 that AML Bitcoin's full launch was "months away," because there was still extensive software development to be done. Despite the government's interference, which did greatly delay the release of full-featured AML Bitcoin, NAC's public YouTube channel documents the improvements made in 2018-19. In June 2018, AML Bitcoin Tokens were listed on several public digital currency exchanges, and a series of videos on the YouTube channel explains how to use each of those exchanges to trade AML Bitcoin. A list of these videos is available at www.amlbitcoinvideos.com.

19. On April 26, 2018, I met with Port of San Francisco commissioner Leslie Katz, and California's Lieutenant Governor Gavin Newsom, to discuss possible uses of AML Bitcoin and my identity verification technology by the Port of San Francisco and the State of California. That event occurred on April 26, 2018. A true and correct copy of an email from Katz, attaching a picture of me and Lieutenant Governor Newsom from the event, is attached hereto as Exhibit 9.

20. I had a subsequent meeting with Port of San Francisco officials on April 27, 2018, to continue discussing possible uses of AML Bitcoin technology by the Port. A true and correct copy of emails relating to that meeting and a Powerpoint Presentation given at that meeting is attached hereto as Exhibit 10.

21. NAC began public beta testing of the full-featured AML Bitcoin product in November 2019. Information regarding how to operate the AML Bitcoin during the beta test was publicly available through NAC's public YouTube channel, posted on November 26, 2019, at https://www.youtube.com/watch?v=ztwyqpmlSzU. One of the videos uploaded on November 26, 2019, titled "How to Verify Your Identity with the Virtual Identity Network (VIN) System Through AMLWallet.com," discusses how to use the identity verification system unique to AML Bitcoin.

22. On April 12, 2020, AML Bitcoin launched with its intended biometric security features, and AML Bitcoin Token holders were able to exchange their tokens for AML Bitcoins on a 1:1 exchange basis. AML Bitcoins are now listed on LBank Exchange, as explained at https://twitter.com/LBank_Exchange/status/1270607048628002816.

**C.    Procedural History of This Case**

23. There is no currently pending criminal proceeding or indictment of me. I have been informed that the government has an ongoing criminal investigation against me, but as of today, it has not filed any charges or sought any indictment.

24. The Court issued an Order on June 4, 2020 admonishing the government to "conduct a careful, responsible, and conservative assessment of what truly cannot be disclosed Andrade." Despite this instruction, the government has not produced any evidence to me in this case, including any evidence supporting its motion to stay.

25. On June 13, 2020, I served a copy of a Rule 11 motion for sanctions and dismissal of the Complaint on the government by email and FedEx to AUSA Chris Kaltsas. A true and correct copy of the motion served on the government, without accompanying declaration and exhibits, is attached hereto as Exhibit 11.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 18th day of June, 2020, at Missouri City, Texas.

*R. Marcus Andrade*
Rowland Marcus Andrade