## **<u>Exhibit 1</u>**



September 24, 2017

Mr. Japheth Dillman
3563 Pierce Street
San Francisco, CA 94123

     Re:  Employment Agreement

Dear Japheth,

    NAC Foundation, LLC (the "Company") is pleased to extend this offer of employment to you on the terms and conditions set forth below (collectively, this "Agreement").

1. Position and Duties. Your position with the Company will be Chief Strategy Officer, and you will report to the President/CEO. Your employment status with the Company will be that of an exempt at-will employee. Your responsibilities will include those outlined in the proposal you sent to us, attached as Addendum A, as well as additional duties assigned to you by the President/CEO or his designee(s).  You will not be provided with an office, but we understand that you will work from your current location. The Company may modify your job title, work location, duties, and responsibilities from time to time as it deems necessary or appropriate, including based on the success of the achievement of the goals and objectives in your proposal (Addendum A).  Within five (5) days from the date this Agreement is signed by NAC, you will deliver to the Company a proposed budget for those marketing efforts, including engaging contract writers, a public relations firm, mobile and FB targeted ads set forth in Addendum A, as well as a travel budget, all of which may be approved or rejected at the Company's sole discretion.

2. Employment at Will.  Your employment is for no definite period and is terminable at-will by you or the Company, with or without cause and with or without notice. Nothing contained in this Agreement shall alter the employment-at-will status. No modification of the employment at will status shall be valid unless in writing and signed by the Company's President/CEO.  If your employment is terminated by you or the Company, you agree to provide the President/CEO with a memorandum describing the status of the matters/projects on which you are then working, including the names and all contact information for all persons with whom you are in communication

Japheth Dillman
September __ 2017
Page 2

concerning same sufficient to enable the Company to understand the details of the progress of your matters/projects prior to the termination.

3. Compensation.  As compensation, you will receive One Million (AMLBit 1,000,000) AML BitCoins (and until such coins become available, AML Tokens, which shall be convertible into AML BitCoins on a 1:1 ratio), payable in four equal payments of Two Hundred Fifty Thousand (250,000) on the following dates:  October 1, 2017, December 31, 2017, June 30, 2018, and December 31, 2018.  Your receipt of such coins shall be subject to your agreement to the terms and conditions on the relevant websites, including, but not limited to, amlbitcoin.com, amlbitcoinwallet.com, and amltoken.com, and conditioned on you being registered and verified by the Company, including, obtaining a digital identity profile associated with the Digital Identity Trust Network, as well as on your continued employment with the Company. In the event your employment with the Company terminates during a quarter you will receive a pro-rated amount of the AML BitCoins based on a ratio, the denominator of which is the number of days in the quarter and the numerator of which is the number of days in such quarter that you have worked.  However, if the Company terminates your employment as a result of a breach of your fiduciary duties to the Company or based on conduct that constitutes a crime or is based on a deliberately fraudulent act or omission or on any willful violation of law, such payment will not be pro-rated.

4. Expenses.  The Company will pay your reasonable travel and related expenses incurred in the course of performing services for the Company.  For expenses that are anticipated to exceed $250, you shall obtain advance authorization from the President/CEO.  You shall maintain a detailed log of expenses and submit the request for reimbursement with receipts for the expenses not less than 15 days after incurring the expenses, and the Company will reimburse you for pre-approved expenses within 30 days.

5. No Right to Bind Company to Contracts.   You shall not have the authority to bind the Company to contracts, other than as may relate to your travel and matters incidental to the performance of your duties to the Company.

6. Taxation. The Company shall not withhold any taxes associated with your employment, including, federal, state and local income taxes or employment or other taxes, but you shall be responsible for payment of your taxes as required by applicable law.  You agree that you have received no advice and neither the



Company, nor any of its officers, directors, attorneys or agents, has advised you or made any representations to you concerning the taxation of the compensation set forth in this Agreement, except as otherwise stated in this paragraph. You understand that the Company does not have a duty to design its compensation policies in a manner that minimizes your tax liabilities, and you agree that you will not make any claim against the Company, its officers, directors, attorneys or agents related to tax liabilities arising from your employment arrangement and/or compensation.

7. Other Benefits. You shall not receive any employment benefits, other than the compensation referred to above, and you shall have the right to identify yourself as Chief Strategy Officer for the Company. Accordingly, you will not receive vacation days, sick days or leave, medical or dental benefits, employee benefit plans, 401(k) Plans, profit sharing plans, etc. You agree that you will not make any claim against the Company, its officers, directors, attorneys or agents related to employment benefits or the lack thereof.

8. Confidential Information, Non-Solicitation and Invention Assignment. As a condition of your employment, you must enter into a Confidential Information, Non-Solicitation and Invention Assignment Agreement ("Confidential Information Agreement") with the Company, a copy of which is attached hereto as Addendum B. The provisions of said Confidential Information Agreement shall survive your termination of employment and the termination of this Agreement.

9. Outside Business Interests and Conflicts. The Company understands that you have other businesses in which you are actively involved. Accordingly, the Company does not expect that you will devote 100% of your energy and efforts to your work for the Company and its business activities. Notwithstanding this, you agree that you will not to act in any way contrary to the best interests of the Company, and you agree that in your position with the Company you are a fiduciary of the Company and have fiduciary duties to the Company. You agree to list all companies or other business interests in which you are actively engaged in Addendum C to this Agreement, and you represent and warrant that those businesses or companies, and your positions or services performed for those businesses or companies, presents no conflict of interest, and that no information and knowledge you obtain from and based on your position with the Company will be used to benefit those businesses and companies nor can such information benefit such businesses and companies. You agree that, in the event you become actively engaged in the business of any other business or

NAC Foundation LLC, 7495 W. Azure Drive, Las Vegas, Nevada 89130

Japeth Dillman
September __ 2017
Page 2

company, you will deliver an amendment to Addendum C identifying such other business or company.  You agree that you will not engage in any outside work that conflicts with your duties to the Company.  You warrant and represent that neither your making this Agreement and the Confidential Information, Non-Solicitation, and Invention Assignment Agreement, nor your performance under this Agreement and the Confidential Information, Non-Solicitation, and Invention Assignment Agreement will violate, breach or conflict with any other agreement, or with any judgment, order, injunction, decree, regulation or ruling of any court or governmental entity to which you are a party or subject.

10. Employment Verification. This offer of employment is made subject to you having the legal right to work in the United States. The Company is required by federal law to document that each new employee (both citizen and non-citizen) is legally authorized to work. Therefore, all employees must complete a Form I-9 and provide proof of their identity and eligibility to work in the United States within three (3) business days from their start date. The types of documents that can be used to establish identity and employment eligibility are listed on the Form I-9.

11. Company Policies. Your employment with the Company is subject to all Company policies and procedures, and the Company retains the right to change its policies or procedures at any time. You must abide by the Company's ethics code and policies at all times during your employment with the Company.

12. Use of Name or Likeness. The Company shall have the right (but not the obligation) to use, publish and broadcast your name, likeness and approved biographical material to advertise, publicize and promote the business of Company and of its affiliates, but not for the purposes of direct endorsement without your consent, which consent shall not be unreasonably withheld. Your failure to approve any such materials within three (3) business days after receipt of a written request for such approval from the Company shall constitute your approval thereof.

13. Return of Property. You agree that, following the termination of your employment for any reason or at any time earlier upon request by the Company, you shall return all property of the Company which is then in or thereafter comes into your possession, including, but not limited to, documents, contracts, agreements, plans, photographs, books, notes, electronically stored data and all copies  of the  foregoing, as well as any computers, laptops, notebooks, cellular telephones, or other materials or equipment supplied by the Company to you.



14. Resignation as Officer or Director. Upon termination of your employment for any reason, you shall resign immediately from each position that you then hold as an officer or director of the Company or any affiliate, or related entity thereof.

15. No Other Promises. No commitments affecting the terms of your employment are binding on the Company unless contained in a writing signed by both you and the President/CEO.  You acknowledge that this Agreement is intended as written, and that no marginal notations or other revisions to this Agreement and the Confidential Information Agreement (as defined below) are binding on the Company unless expressly consented to in writing by the President/CEO. You acknowledge that in deciding to accept employment with the Company, you have not relied on any promises, commitments, statements or representations, whether spoken or in writing, made to you by any Company representative, except for what is expressly stated in this Agreement and the Confidential Information Agreement. This Agreement contains the entire agreement of the parties.  No other agreement, statement or promise made on or before this Agreement will be binding on the parties.  This Agreement is the final expression of, and contains the entire agreement between, the parties with respect to the subject matter hereof and supersedes all prior understandings with respect thereto.

16. Arbitration and Dispute Resolution.

    a) All disputes, controversies or claims arising out of or relating to this Agreement, your employment by the Company, your relationship with the Company, or as to any other matter between us, including concerning the interpretation of this Agreement, the Confidential Information, Non-Solicitation, and Invention Assignment Agreement, or any agreement between us, whether for breach of contract, for a tort, or otherwise, shall be resolved and adjudicated by binding arbitration before ADR Services, Inc. (if available in the venue for adjudication of disputes or before JAMS, Inc. if ADR Services, Inc. is not available in such venue) and shall be conducted in accordance with the commercial arbitration rules of the such arbitration forum, except as otherwise provided herein. The arbitration shall be conducted in the jurisdiction and venue set forth elsewhere in this Agreement. The arbitration shall be conducted by a single arbitrator.  The arbitrator shall be selected in accordance with the rules of the selected arbitration organization.  The parties intend the

Japheth Dillman
September __, 2017
Page 2

arbitration to be expedited. The arbitration shall be commenced by a demand for arbitration. If a party fails to respond to the demand to arbitrate within ten (10) business days, the aggrieved party may apply ex parte to the Court in the jurisdiction and venue provided elsewhere in this Agreement for an order to arbitrate, unless the rules of the arbitration forum do not require such an order. An arbitration award may be enforced by applying to the Court in the jurisdiction and venue provided elsewhere in this Agreement. The choice of law provided elsewhere in this Agreement shall be applied in any arbitration proceedings, without regard to that jurisdiction's choice-of-law principles and rules. The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, as applicable (including, without limitation, reasonable attorneys' fees and costs) shall be borne by the unsuccessful party, as determined by the arbitrator, and shall be awarded as part of the arbitrator's award. The arbitration shall be binding. In the event that the arbitration includes or would include the adjudication of facts, law or claims common to parties not bound by an arbitration provision such that adjudication in the arbitration may result in inconsistent and/or conflicting findings, rulings or orders, or if such adjudication is based on transactions or series of transactions that involve parties who would not be bound by this arbitration provision, the parties hereto agree that the dispute will be adjudicated in a court in the jurisdiction and venue provided elsewhere in this Agreement, unless such parties agree to participate in the arbitration, so that all necessary parties can be joined to avoid inconsistent and/or conflicting findings, rulings or orders.

b)  Prior to initiating an arbitration proceeding, the parties shall make a good faith attempt to resolve the dispute through mediation by providing written notice to the other party of a demand for mediation and the responding party shall have ten (10) business days to respond in writing. No party shall be entitled to recover any fees or costs in arbitration if they have failed to mediate in good faith. The mediator will be selected from the same alternative dispute provider specified above, unless the parties agree in writing to a different mediator.

c)  If the provisions for arbitration in this Agreement are, for any reason, invalidated or deemed unenforceable, then you and the Company agree to submit to the exclusive jurisdiction and venue of the federal and state

courts located in Clark County, Nevada, USA, for any legal suit, action or proceeding arising out of or based upon your employment by the Company, the breach of any employment agreement, the termination of your employment with the Company, or any other aspect of your relationship with the Company, including claims you may have against the Company or against its officers, directors, supervisors, managers, employees, agents or attorneys, in their capacity as such or otherwise, or claims that the Company may have against you.  Further, you agree that this forum selection clause is mandatory and not permissive and you agree not to object to adjudication in Clark County, Nevada on grounds of forum non-conveniens.

d) Waiver of Trial by Jury. THE PARTIES UNDERSTAND AND FULLY AGREE THAT BY ENTERING INTO THIS AGREEMENT TO ARBITRATE THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE A TRIAL BY JURY, AND ARE GIVING UP THEIR NORMAL RIGHTS OF APPEAL FOLLOWING THE RENDERING OF A DECISION, EXCEPT AS THE FEDERAL ARBITRATION ACT AND APPLICABLE FEDERAL LAW PROVIDE FOR JUDICIAL REVIEW OF ARBITRATION PROCEEDINGS.

17. Applicable law, Jurisdiction and Venue. This Agreement is governed by and construed in accordance with the laws of the State of Nevada applicable to agreements made and to be performed wholly within the State and for torts committed within the State, irrespective of such State's choice-of-law principles. Jurisdiction and venue for adjudication of any dispute arising out of or related to this Agreement shall be solely and exclusively in Las Vegas, Nevada.

18. Other Miscellaneous Terms. No waiver of or failure by either party to enforce any of the provisions, terms, conditions, or obligations herein shall be construed as a waiver of any subsequent breach of such provision, term, condition, or obligation, or of any other provision, term, condition, or obligation hereunder, whether the same or different in nature.  No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts. If any term of this Agreement is held to be invalid or unenforceable, such term or provision shall be deemed severed from this Agreement, and the remainder of the Agreement shall be enforced according to its terms.  The provisions of the Agreement shall be binding upon and shall inure to the benefit of the Company and its successors and assigns. You agree that you may not and shall not assign this Agreement.

*NAC Foundation LLC, 7495 W. Azure Drive, Las Vegas, Nevada 89130*

Japheth Dillman
September __ 2017
Page 2

Sincerely yours,
NAC Foundation, LLC

By: _____
Marcus Andrade
President and Chief Executive Officer

I have read and understand the terms and conditions of employment stated in the foregoing Agreement, and I accept  employment with the Company upon the terms and conditions stated therein:



Japheth Dillman

## ADDENDUM A TO EMPLOYMENT AGREEMENT

The Chief Strategy Officer ("CSO") will be responsible for developing, communicating, executing, and sustaining corporate strategic initiatives, under the direction of the President/Chief Executive Officer (CEO).  The CSO will often take point lead on new channels of sales initiatives, and defining new markets for strategic partnerships.  While the CEO and Chief Sales Officer (or CMO) will likely pursue the majority of business development leads, when new industries are considered it will often fall to the CSO to take initiative in defining strategic and key partnerships and people to pursue in order to affect the valuation of the AML BitCoin.  It will also be the responsibility of the CSO to advise the CEO in assessing whether strategic initiatives, at all levels of the organization, are in line with the driving the price of AML BitCoin. The CSO will also advise the CEO on strategic areas of acquisition.

October 1st Deliverable:
1)  Begin releasing a steady stream of high level Tech press to online publications:
Targets; TechCrunch, VentureBeat, Forbes, The Verge, CNet, Mashable, TheNextWeb.com, Digital Trends, Tech Radar, Wired, and Recode.   The goal is to get 3-5 pieces of news coverage a week until launch (MORE if possible).
2)  Recommend to CEO & Manage a PR firm that specializes in Cryptocurrency
3)  Contract a small team of writers
4)  Advise internal team on mobile & FB marketing that lead to ICO purchases.
5) Follow up with Commissioner of Port of San Francisco
6)  Contribute strategically and participate with the CEO in all matters building the coin's brand in advance of the ICO
7)  Identify Government opportunities for public relations announcements in advance of the ICO
8) Begin strategic discussions with governmental groups that have not been forged as of yet (China, Mexico, Columbia, etc.)
9)  Commence discussions with at least 5 Silicon Valley (and global) tech companies to get to internal channels of decision-making power at tech powerhouses (such as:  Google, Amazon, Microsoft, Salesforce, Facebook, and Lyft/Uber… this initial list was chosen for a very specific purpose)
10)  Try to bring on board at least 5 distinguished Blockchain/Cryptocurrency advisors (ultimately who can increase the price of AML BitCoin)
11) Work vigorously to get Coinbase and other exchanges and trading sites to list AML Bitcoin.

December 31st Deliverable:
1)  Continue releasing a steady stream of press to online publications, the focus now is more on the specific Crypto news outlets such as:  CoinDesk, Coin Telegraph, CryptoWatch, Reddit, CryptoInsider, CryptoCoin News, and more.
2)  Refocus the PR firm based on their own deliverables being (or not being) met
3)  Continue to manage the small team of writers

1

4)  Work more closely with the internal team now on mobile & FB marketing ads, now guiding the specific creative used.

5) Now drive to a close with the Commissioner of Port of San Francisco

6)  Continue to contribute strategically and possibly accompany the CEO in matters of Panama, Estonia, and more

7)  Focus on the governmental groups that had initial interest and find more government groups where new ground needs to be broken.  A focus on:  European countries, Latin America (especially where the drug trade is notorious), high-tech Asian countries, and India

8)  Now aim for another dozen Silicon Valley (and global) tech introductions to get to internal channels of decision-making power at tech powerhouses

9)  Try to bring on board at least another 10 distinguished Blockchain/Cryptocurrency advisors (ultimately who can drive the price of AML BitCoin up)

June 30th and December 2018 Deliverables:

Now we focus on new industries, new governments, deeper relations with tech companies and continue our focus on major publications (even begin penetrating printed press outlets).  The CSO will compose an internal playbook for AML BitCoin that addresses these deliverables…

1)      Identify a hit-list of top 12 governments to actionably close new deals (1 a month), with dozens more targeted in a less aggressive manner.

2)      Work closely with the CEO in defining new industries (housing?  Healthcare?  Finance?) and identify the top 5 individual targets within each industry outlined in the internal playbook for the company

3)      Identify and target a hit-list of 50 tech companies to actionably close new deals with

4)      Identify major cryptocurrency investors and pursue their interest in buying large bulks of AML BitCoin

5)      Now refine and more deeply target marketing channels that worked based on channel analytics and retargeting based on attribution analysis

6)      Identify holes in the company where acquisitions make more sense than building internally, begin strategically guiding the CEO in these acquisitions and advise on the price of these acquisitions

7)      Work with the CEO in pitching to large investors for possible sale of equity when funding is needed beyond what the AML BitCoin can provide

## ADDENDUM B to EMPLOYMENT AGREEMENT

## CONFIDENTIAL INFORMATION, NON-SOLICITATION, AND INVENTION AGREEMENT

This Confidential Information, Non-Solicitation and Invention Assignment Agreement (this "Confidential Information Agreement") is made as of September 24, 2017 by and between Japheth Dillman ("Employee") and NAC Foundation, LLC (the "Company") as a condition of and in connection with Employee's employment by the Company.

### 1. Inventions.

**1.1    Ownership.** If at any time during Employee's employment, whether or not during regular working hours, Employee, either alone or with others, makes conceives, creates, discovers, invents, develops, improves, adds to, or reduces to practice any invention, modification, discovery, drawing, design, concept, idea, specification, development, audiovisual work, literary work, musical work, dramatic work, pictorial, graphic or sculptural work, development projects, sound recordings, improvement, process, software program, work of authorship, documentation, formula, data, technique, know-how, trade secret, trade name, domain name, logos and get-up, computer data, databases, applications for registration, renewals and extensions in relation to any of the above, or any similar intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright, trademark or similar statutes), and all intangible rights and privileges of a nature similar, analogous or allied to any of the above in any part of the world (herein called "Developments") that: (a) relate to the present or planned business of the Company or its affiliates or any of the coins, products, or services being developed, designed, created, manufactured, offered, licensed, or sold by the Company or its affiliates, or which may be used in relation therewith; (b) result from responsibilities undertaken by or assigned to Employee by the Company; or (c) result from the use of premises or property (whether tangible or intangible, including Trade Secrets and proprietary and confidential information) owned, leased or contracted for by the Company, such Developments and the benefits thereof are and shall immediately become the sole and absolute property of the Company and its assigns, as works made for hire or otherwise, and Employee shall promptly disclose in writing to the Company's President/CEO (or any persons designated by him) each such Development, as may be necessary to ensure the Company's ownership of such Development. Employee further acknowledges that all original works of authorship that are made by Employee (solely or jointly with others) within the course and scope of Employee's employment and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

**1.2    Assignment and Waiver of Moral Right**s. Employee hereby assigns any rights (including, but not limited to, any copyrights and trademarks) Employee may have or acquire in the Developments and benefits and/or rights resulting therefrom to the Company and its assigns without further compensation and shall

communicate, without cost or delay, and without disclosing to others the same, all available information relating thereto (with all necessary plans and models) to the Company. Notwithstanding the above, to the extent that the Developments do not belong to the Company, then to the fullest extent permitted by the law, Employee shall and hereby does assign to the Company, by way of present assignment of future rights in respect of rights not yet created, the Developments and hold in trust for the benefit of the Company the ownership of the Developments until they belong entirely to the Company. In addition to the foregoing assignment of Developments to the Company, Employee hereby irrevocably transfers and assigns to the Company: (a) all worldwide patents, patent applications, copyrights, mask works, trade secrets and other intellectual property rights in any Developments, and (b) any and all "Moral Rights" (as defined below) that Employee may have in or with respect to any Developments. Employee also hereby forever waives and agrees never to assert any and all Moral Rights Employee may have in or with respect to the Developments, even after termination of Employee's employment with the Company. For the purposes of this Confidential Information Agreement, "Moral Rights" mean any rights to claim authorship of the Developments, to object to or prevent the modification of any Developments, or to withdraw from circulation or control the publication or distribution of any Developments, and any similar right, existing under judicial or statutory law of any country in the world, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral rights," "artist's rights," "droit moral," or the like.

       **1.3**    <u>**Records**</u>. Employee will keep and maintain adequate and current written records of all Developments (in the form of notes, sketches, drawings, codes, programs, etc., and as may be specified by the Company), which records will be available to and remain the sole property of the Company at all times.

       **1.4**    <u>**Further Assistance**</u>. Employee will, during Employee's employment and at any time thereafter, at the request and cost of the Company, promptly sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized agents may reasonably require for giving full effect to this Section 1 and securing to the Company or its assignee the full benefits of the rights, power, privileges and remedies conferred on the Company by this Section 1 to the fullest extent permitted by the law, including but not limited to: (a) to apply for, obtain, register and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights, trademarks or other analogous protection in any country throughout the world and, when so obtained or vested, to renew and restore the same; and (b) to defend any judicial, opposition or other proceedings in respect of such applications and any judicial, opposition or other proceedings or petitions or applications for revocation of such letters patent, copyright, trademark or other analogous protection. In the event the Company is unable, after reasonable effort, to secure Employee's signature on any application for letters patent, copyright or trademark registration or other documents regarding any legal protection relating to the Developments, whether because of Employee's physical or mental incapacity or for any other reason whatsoever, Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Employee's agent and attorney-

in-fact, to act for and on Employee's behalf and  stead to execute and file any such application or applications or other documents and to do all other lawfully  permitted acts to give full effect to this Section 1, including furthering the prosecution and issuance of letters  patent, copyright or trademark registrations or any other legal protection thereon with the same legal force and  effect as if executed by Employee. The Company shall provide Employee with copies of any documents it signs on Employee's behalf as Employee's attorney-in-fact pursuant to the immediately preceding sentence. In addition,  Employee will not do anything, whether by omission or commission, during or after Employee's employment, to  affect or imperil the validity of Developments owned or used by the Company and its related entities.

       **1.5**   **Exceptions**. In order to avoid disputes over the application of this assignment to prior  inventions or copyrightable materials, Employee has listed on Exhibit 1 to this Confidential Information Agreement  descriptions of patentable inventions and copyrightable materials that Employee has developed and reduced to  practice prior to the date Employee began employment with the Company and that are, accordingly, excepted  from the provisions of this Section 1 ("Prior Inventions"). If no Prior Inventions are listed on Exhibit 1, Employee  represents that Employee has no such inventions or materials at the time of signing this Confidential Information  Agreement. Notwithstanding the foregoing, Employee shall not include or incorporate any elements from any Prior  Inventions into any Developments without the Company's prior written permission, and, to the extent that  Employee does, Employee grants the Company a nonexclusive, royalty-free, perpetual, irrevocable, transferable  worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for  sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit  such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. Employee will not incorporate any invention, improvement,  development, concept, discovery, work of authorship or other proprietary information owned by any third party  into any Invention without the Company's prior written permission. Employee shall not disclose to the Company,  use, or induce the Company to use any confidential or proprietary information or trade secrets belonging to third  parties, including any confidential information or trade secrets belonging to prior employers. Employee represents  and warrants that he or she has returned all trade secret, confidential and proprietary information belonging to all  prior employers. Employee further agrees to indemnify and hold the Company and Related Parties harmless  against any and all costs, attorney's fees, losses, liabilities and expenses resulting from claim, demands, suits,  actions or judgments arising out of or in any way related to Employee's representations in this Section 1.

       EMPLOYEE UNDERSTANDS THAT THE PROVISIONS OF THIS AGREEMENT REQUIRING ASSIGNMENT OF  INVENTIONS TO THE COMPANY DO NOT APPLY TO ANY INVENTION THAT IS EXEMPT FROM ASSIGNMENT UNDER  CALIFORNIA LABOR CODE SECTION 2870 (THE TEXT OF WHICH IS ATTACHED HERETO AS EXHIBIT 2). IN COMPLIANCE WITH LABOR CODE SECTION 2871, EMPLOYEE WILL DISCLOSE TO THE COMPANY PROMPTLY IN WRITING ANY INVENTIONS THAT EMPLOYEE BELIEVES MEET THE CRITERIA OF CALIFORNIA LABOR CODE SECTION  2870. SUCH DISCLOSED

INVENTIONS SHALL BE RECEIVED BY THE COMPANY IN CONFIDENCE PURSUANT TO LABOR CODE SECTION 2871.

    **2.**    **Non-Competition during Employment**. Employee acknowledges that during Employee's employment with the Company, Employee has a fiduciary duty and duty of loyalty to the Company. Employee therefore agrees that, during Employee's employment, Employee will not engage in any employment, business, or activity that is in any way competitive with the business or proposed business of the Company, and Employee will not assist any other person or organization in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company. The provisions of this paragraph shall apply both during normal working hours and at all other times including, but not limited to, nights, weekends and vacation time, while Employee is employed by the Company.

    **3.**    **Restrictive Covenants**.

    3.1    Employee understands that the nature of the Employee's position gives the Employee access to and knowledge of Confidential Information (as defined in Section 4.1 below) and places the Employee in a position of trust and confidence with the Company and that the Employee will benefit from the Company's goodwill. The Employee understands and acknowledges that the Company invested significant time and expense in developing the Confidential Information and goodwill. The Employee further understands and acknowledges that the restrictive covenants below are necessary to protect the Company's legitimate business interests in its Confidential Information and goodwill. The Employee further understands and acknowledges that the Company's ability to reserve these for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company and that the Company would be irreparably harmed if the Employee violates the restrictive covenants below. In consideration of the Company's provision of and Employee's access to the Company's Confidential Information Employee agrees to the following restrictive covenants.

    **3.2**    **Non-Solicitation of Employees**. Employee understands and acknowledges that the Company has expended and continues to expend significant time and expense in recruiting and training its employees and that the loss of employees would cause significant and irreparable harm to the Company. Employee agrees that during Employee's employment and for a period of twelve (12) months following the termination of Employee's employment for any reason, Employee will not, either on Employee's own behalf or on behalf of any other entity or person, induce, solicit, recruit or encourage any employee to leave the employ of the Company or cease providing services to the Company, which means that Employee will not: (i) disclose to any third party for purposes of employment the names, compensation, contacts, backgrounds or qualifications of any employees or otherwise identify them as potential candidates for employment or to provide services; or (ii) personally or through any other person (excluding advertisements or generalized recruiting not targeted at Company employees) approach, recruit, interview or otherwise solicit employees of the Company to work for Employee or any other person or employer or

to terminate their employment with the Company or violate any  agreement with or duty to the Company.

        **3.3**   **Non-Solicitation Using Confidential Information.**  Employee acknowledges and agrees  that pursuant to applicable state law, such as the Uniform Trade Secrets Act, (NRS. 600 A), federal law, and the terms of this  Confidential Information Agreement, Employee may not use or disclose (or threaten to use or disclose) any  Company trade secrets or Confidential Information without the Company's consent. This obligation to maintain the  confidentiality of the Company's trade secrets and Confidential Information has no time limit and continues in  perpetuity, so long as Company trade secrets and Confidential Information remain confidential and/or trade secrets.  Employee therefore agrees that both during Employee's employment with the Company and thereafter in  perpetuity, Employee will not use or disclose the Company's trade secrets or Confidential Information to solicit,  either on Employee's own behalf or on behalf of any other person or entity, any person or entity with which the  Company or its affiliates has a material business or contractual relationship, including but not limited to customers,  vendors, providers, employees or business partners of the Company.

        **4.**    **Confidentiality.**

        **4.1**   **Confidential Information**. Employee understands and agrees that in the course of Employee's employment with the Company, Employee will acquire confidential information not generally made  available to the public that is disclosed or made available by the Company to Employee concerning the Company's  operations, clients, executive officers, software developers, consultants, advisors, and other employees and independent contractors, information related to  existing or potential coins, technologies, products, designs, sketches, technical information, programming, code, intellectual property,  formulas or specifications, future plans and methods of doing business, know-how, discoveries, inventions,  concepts, techniques, designs, customer and supplier lists, marketing information, business strategies, financials  and financial information, subscriber and subscriber fees, projections, business plans and budgets, research and  development projects, the material economic and non-economic terms of the Company's relationships with its  distributors, business partners and suppliers, and trade secrets (as defined by law) (collectively "Confidential Information"), which information Employee understands and agrees would be damaging to the Company if  disclosed to a competitor or made available to any other person or corporation engaged in a similar business.  Employee agrees that all such Confidential Information is the sole property of the Company and is extremely  valuable to the Company, and the Company's business and success depend upon the use and protection of the  Confidential Information because the Confidential Information is not generally or publicly known and thus has  commercial value. Employee understands and agrees that any such Confidential Information will be divulged to  Employee in confidence and Employee understands and agrees that at all times, during Employee's work for the  Company and after Employee's work for the Company ends, Employee will keep such Confidential Information  secret and confidential and will not disclose it,

except in connection with Employee's work for the Company or as required by law.

**4.2**    **Third Party Confidential Information**. Employee understands and agrees that in the course of Employee's employment with the Company, Employee will receive and have access to the confidential information of certain third parties related to the Company, including but not limited to customers, partners and content providers. Employee understands and agrees that both Employee and the Company have duties to protect and maintain the confidentiality of this third-party material. Employee understands and agrees that any such third-party information will be divulged to Employee in confidence and understands and agrees that at all times, during Employee's work for the Company and after Employee's work for the Company ends, Employee will keep such third-party information secret and confidential and will not disclose it, except in connection with Employee's work for the Company.

**4.3**    **Exceptions.** Employee's undertakings and obligations under this Section 4 will not apply, however, to any Confidential Information which: (a) is or becomes generally known to the public through no action on Employee's part; (b) is generally disclosed to third parties by the Company without restriction on such third parties; (c) is approved for release by written authorization of the Company; or (d) is required to be disclosed by law, regulation, order, decree or legal process, provided that Employee gives prompt written notice to the Company prior to such disclosure so that the Company may seek a restraining order or pursue other recourse.

**4.4**    **Immunity.** 18 U.S.C. § 1833(b) states:

"(b) IMMUNITY FROM LIABILITY FOR CONFIDENTIAL DISCLOSURE OF A TRADE SECRET TO THE GOVERNMENT OR IN A COURT FILING.
IMMUNITY. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that-is made-in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

USE OF TRADE SECRET INFORMATION IN ANTI-RETALIATION LAWSUIT. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order."

Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to Federal, State, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure and otherwise in compliance with the procedural rules of the forum of the adjudication of

a dispute or litigation involving the trade secret(s). Nothing in this  Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b).

      **4.5**   **Return of Company Property**. All Trade Secrets and Confidential Information  are and  shall remain the exclusive and confidential property of the Company.  You shall promptly notify the Company if you  have reason to believe that the unauthorized use, possession, or disclosure of any trade secrets or Confidential Information has occurred or may occur. All materials containing trade secrets and/or Confidential Information  shall be returned, along with any copies, compilations or notes made thereof or therefrom, to the Employer upon  the separation of your employment for any reason, or earlier upon request.

      **5.**   **Representations and Warranties.**

      **5.1**   **Other Agreements**. Employee hereby represents and  warrants that, except as  Employee has disclosed in writing to the Company, Employee is not bound by the terms of any agreement with any  previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information in the course of Employee's work for the Company.

      **5.2**   **Others' Confidential Information**. Employee hereby represents and warrants that to the  best of Employee's knowledge Employee's performance of all the terms of this Confidential Information  Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence  proprietary information, knowledge or data acquired by Employee in confidence or in trust prior to Employee's  work for the Company, and Employee will not disclose to the Company or induce the Company to use any  confidential information or material belonging to any previous employer or others.

      **6.**   **Other Obligations**. Employee acknowledges that the Company from time to time may have  agreements with others which impose obligations or restrictions on the Company regarding inventions made  during the course of work under such agreements or regarding the confidential nature of such work. Employee  agrees to take all action necessary to discharge the obligations of the Company under such agreements, to the  extent the Company makes such obligations known to Employee.

      **7.**   **Miscellaneous.**

      **7.1**   **Terms of Employment**.  Employee agrees that this Confidential Information Agreement  does not purport to set forth all of the terms and conditions of Employee's employment, which are set forth in the employment agreement between the Company and Employee in that certain letter agreement of even date herewith (the "Employment Agreement"), and that, as an employee of the Company, Employee has obligations to the Company pursuant to the Employment  Agreement which are not set forth in this Confidential Information Agreement.

**7.2** **Severability.** The invalidity or unenforceability of any provision of this Confidential Information Agreement will not affect the validity or enforceability of any other provision of this Confidential Information Agreement.

**7.3** **Entire Agreement**. This Confidential Information Agreement supersedes all prior agreements, written or oral, between Employee and the Company relating to the subject matter of this Confidential Information Agreement. This Confidential Information Agreement may not be modified, changed or discharged in whole or in part, except by an agreement in writing signed by Employee and the Company.

**7.4** **Successors and Assigns**. This Confidential Information Agreement will be binding upon Employee's heirs, executors and administrators and will inure to the benefit of the Company and its successors and assigns.

**7.5** **Employment.** The use of the term "employment" shall mean and refer to Employee's performance of services for the Company regardless of the technical classification of Employee (e.g., as a partner, employee, etc.). The use of the term "employment" is for ease of reference only and does not constitute any direct or indirect assertion regarding Employee's proper classification.

**7.6** **Waivers**. No delay or omission by either party in exercising any right under this Confidential Information Agreement will operate as a waiver of that or any other right. All waivers hereunder shall be in writing. A waiver or consent on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

**7.7** **Transfers.** Employee expressly consents to be bound by the provisions of this Confidential Information Agreement for the benefit of the Company or any subsidiary or affiliate thereof to whose employ Employee may be transferred without the necessity that this Confidential Information Agreement be re-signed at the time of such transfer.

**7.8** **Governing Law.** This Confidential Information Agreement is governed by and construed in accordance with the laws of the State of Nevada applicable to agreements made and to be performed wholly within the State and for torts committed within the State, irrespective of such State's choice-of-law principles.

**7.9** **Arbitration.** All disputes arising out of or related to this Confidential Information Agreement shall be governed by applicable provisions of the Employment Agreement.

**7.10** **Remedies.** The restrictions contained in this Confidential Information Agreement are necessary for the protection of the business and goodwill of the Company, and Employee considers them to be reasonable for such purpose. Employee recognizes that irreparable damages would be caused to the Company, and that monetary damages may not compensate the Company for its loss, should Employee

breach the terms of this Confidential Information Agreement. Accordingly, in addition to all other remedies available to the Company at law or in equity, upon a showing by the Company that Employee has violated or is about to violate the terms of this Confidential Information Agreement, the Company may seek an injunction, without proof of actual damages and without the posting of a bond or other security, or declaratory judgment enforcing the terms of this Confidential Information Agreement, including without limitation preventing disclosure or further disclosure by Employee of Confidential Information. Employee also agrees that any breach of this Confidential Information Agreement may result in immediate termination of Employee's employment or other disciplinary action. In the event of any dispute alleging a breach of this agreement, the prevailing party shall be entitled to recover its reasonable costs and attorneys' fees according to proof and to the extent permitted by applicable law.

       **7.11**    **Narrow Construction Where Necessary.** The parties agree that if any one or more of provisions of this Confidential Information Agreement will for any reason be held to be excessively broad as to time, duration, geographical scope, activity or subject, it will be construed, by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it will then appear.

       **7.12**    **Survival.** This Confidential Information Agreement shall survive the termination of Employee's employment for any reason.

       **7.13**    **Termination Certificate.** If requested to do so by the Company, Employee agrees to sign a termination certificate in which Employee confirms that Employee has complied with the requirements of this Confidential Information Agreement and that Employee is aware that certain restrictions imposed upon Employee by this Confidential Information Agreement continue after termination of Employee's work for the Company. Employee understands, however, that Employee's rights and obligations under this Confidential Information Agreement will continue even if Employee does not sign a termination certificate. Employee further agrees that the Company is entitled to communicate Employee's obligations under this Confidential Information Agreement to any of Employee's future employer or potential employer.

Dated: September <u>24</u>, 2017         NAC FOUNDATION, LLC

                       *Marcus Andrade*
                  By: _____

Dated: September 24, 2017

                       Japheth Dillman

9

**Exhibit 1**
**to Confidential Information, Non-Solicitation and Invention Assignment Agreement**

**Prior Inventions, Potential Conflicts, Etc.**

(Please type or print legibly. Attach additional sheets if necessary to provide a complete description. *If you have nothing to disclose, circle "None" below.*)

**LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP**

| Title | Date | Identifying No. or Brief Description |
|-------|------|--------------------------------------|
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |
|       |      |                                      |

**OR** None

 Additional Sheets Attached (State Number of additional sheets)


Signature of Employee: _____
                                    Japheth Dillman

**Exhibit**
**to Confidential Information, Non-Solicitation and Invention Assignment Agreement**

CALIFORNIA LABOR CODE SECTION 2870  INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT

  "(a) Any provision in an employment agreement which provides that an employee shall assign, or  offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an  invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those  inventions that either:
    Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of  the employer; or

    Result from any work performed by the employee for the employer.

    To the extent a provision in an employment agreement purports to require an employee to  assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

## ADDENDUM C to EMPLOYMENT CONTRACT

List each businesses and companies in which you are actively engaged (i.e., other than as a passive investor) and for each specify: (a) the name of the business, (b) the form of entity, (c) a description of the nature of the business of the business or company, (d) the jurisdiction (State, Country and Providence) of incorporation or formation of the business or company, (e) your title or position, and (f) your duties for the business or company. (You may attach additional typed or legibly printed pages).

YetiZen –  Chief Creative Officer: Accelerator and Events series, CA business incorporated in DE.  This company is no longer active but Japheth holds 50% equity in the business, and it may seek a buyer for the portfolio of assets.

ICOBox – Chief Strategy Officer:  ICO Services for companies and advisory services, incorporated in Hong Kong.  Physical coworking space in San Francisco for companies going through an ICO and investment fund to participate in ICOs.  Japheth is compiling the C-Level executive team to run the US offices, and will coordinate all of his jobs to locate in this single office as there is a synergy with ICOBox and the other blockchain focused work he does.  Japheth is a minor shareholder in ICOBox.

Block Bits Capital & EdenCoin – Co-Managing Director and Chief Strategy Officer:  Investment funds investing in a variety of  cryptocurrencies in the trading markets utilizing an in-house proprietary trading algorithm, AI, and Machine Learning.  DE incorporated, doing business in California and Washington states. Japheth is 50% owner in Block Bits Capital and minor shareholder in EdenCoin.

CLEVR – Chief Executive Officer:  CLEVR is a VR & AR studio focused on uniting the fragmented platforms into one social interface, incorporated in DE.  Japheth is 50% owner and has an in-active role as CEO.  He will likely be finding a new CEO to take over his title and will distribute shares of his equity to the new CEO hire.  CLEVR is closing on a $2million round of funding due to close before 2017 ends.

Primary area of focus and breakdown of Japheth's time:

Majority of time spent on AML BitCoin, Minority of time spent between ICOBox & Block Bits Capital/EdenCoin

**Advisory roles for Equity or ICO Tokens:**

- Walc – Augmented Reality Walking Maps mobile App
- Infinite Volume Entertainment – Recording Studio and Music Publisher
- Spin Backup – Data Backup and Restoration
- Earth Twine – Food Tracker
- SVA Games – Game Studio
- KinkBnB – Bed and Breakfast for Alt-Lifestyle
- PlayTable – Augmented Reality Table for Gaming
- David Kram's Unannounced Company – Creating the "Legal Silk Road"
- CanYa – Home Services on the Blockchain
- Aether United – Gaming Tournament Platform