# Exhibit 11

ROWLAND MARCUS ANDRADE
9414 Plaza Point Drive
Missouri City, Texas 77459   USA

In Pro Se

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ONE PARCEL OF REAL PROPERTY LOCATED AT 9414 PLAZA POINT DRIVE, MISSOURI CITY, TEXAS 77459,<br><br>Defendant.<br><hr>ROWLAND MARCUS ANDRADE,<br><br>Claimant.<br><hr>SOLMAZ ANDRADE,<br><br>Claimant.<br><hr>WILMINGTON SAVINGS FUND SOCIETY, FSB as trustee for IRP FUND II TRUST 2A,<br><br>Claimant. | Case No. 3:20-cv-2013-VC<br><br>**NOTICE OF MOTION AND MOTION OF ROWLAND MARCUS ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 11(C); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>*Filed concurrently with DECLARATION OF ROWLAND MARCUS ANDRADE; AND [PROPOSED] ORDER*<br><br>Judge:   Hon. Vince Chhabria<br><br>Trial Date:   None Set<br><br>Hearing Date: August 13, 2020, 10:00 a.m. |

**TO UNITED STATES OF AMERICA AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on August 13, at 10:00 a.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Vince Chhabria, located in the United States Courthouse, San Francisco Courthouse, Courtroom 4, Rowland Marcus Andrade will and hereby does move this Court for SANCTIONS AND DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 11(C).

DOJ REFORM

I respectfully request that the Court sanction the United States for its violation of Fed. R. Civ. P. 11 by: (1) dismissing the Complaint with prejudice, and (2) awarding such monetary sanctions equal to all my legal fees as a result of this 2 year investigation, or as the Court deems appropriate. This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Declaration of Rowland Marcus Andrade filed concurrently herewith, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 3

STATEMENT OF ISSUES PRESENTED ......................................................................... 5

STATEMENT OF FACTS .................................................................................................... 5

   A.  The Invention and Development of AML Bitcoin .................................................... 5

   B.  The Japheth Dillman/VICTIM ONE AML Bitcoin Token Transactions.............................. 8

   C.  Jack Abramoff and His Associates' Extortionate Scheme ................................... 11

ARGUMENT ...................................................................................................................... 13

   A.  There is no evidentiary basis for the government's claims that the allegedly fraudulent statements in the Complaint are false ......................................................... 14

      1.  The alleged statements made regarding development of AML Bitcoin were true. .......... 15

      2.  The allegedly fraudulent statements regarding the use of VICTIM ONE's funds are disproven by the contracts governing his AML Bitcoin Token purchases. ........................... 17

      3.  The allegedly fraudulent statements made regarding business arrangements with governments and ports were true to my knowledge, not fraudulent. ................................... 18

   B.  There is no evidentiary basis specifically for any scheme to defraud VICTIM ONE based on undisputed evidence that has been known to the government. .............................. 19

   C.  There is no evidentiary basis for the Complaint's allegations that the Defendant Property was purchased with proceeds from fraud, or as part of a money laundering scheme. ................ 21

   D.  The government should be sanctioned, and the appropriate sanction is dismissal with prejudice, enjoining the government from filing additional actions against me without leave of court, and an appropriate monetary award. .................................................. 23

CONCLUSION ................................................................................................................. 25

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 11(C)

DOJ REFORM

## TABLE OF AUTHORITIES

**Cases**

*Christian v. Mattel, Inc.*, 286 F.3d 1118 (9th Cir. 2002) ................................................ 13

*Road & Highway Builders v. N. Nev. Rebar*, 284 P.3d 377 (Nev. 2012) ...................................... 17

*United States v. Brugnara*, 856 F.3d 1198 (9th Cir. 2017) ................................................ 15

*United States v. Jinian*, 725 F.3d 954 (9th Cir. 2013).................................................... 15

*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020).................................................... 19

*Willis v. City of Oakland*, 231 F.R.D. 597 (N.D. Cal. 2005) ............................................ 24

**Statutes**

18 U.S.C. § 1343 ...................................................................................... 14

18 U.S.C. § 981 ........................................................................................ 3

**Rules**

Fed. R. Civ. P. 11 .................................................................................. 5, 13

Fed. R. Civ. P. 11(c)(2) ................................................................................ 4

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The United States has instituted this civil forfeiture action, seeking to confiscate my residence in Texas, based on factual allegations that lack evidentiary support and that cannot support a claim for civil forfeiture under 18 U.S.C. § 981. Specifically, the government alleges that I and my property are involved in wire fraud and/or money laundering committed primarily by an individual identified as J.D., in connection with his solicitation of an individual identified as VICTIM ONE to invest in the cryptocurrency business I created and invented called AML Bitcoin. But the government's Complaint lacks evidentiary support and a legal basis in three critical ways: (1) the government cannot provide evidence that any of the statements it alleges in the Complaint to be fraudulent are fraudulent,, because they are in fact true; (2) the government cannot demonstrate any specific intent to defraud, because I wasn't aware of VICTIM ONE when he made the purchases the government alleges to have been induced by fraud; and (3) the government cannot trace the proceeds of any alleged fraud to the defendant property.

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 11(C)

DOJ REFORM

1   AML Bitcoin, the cryptocurrency at the heart of the government's Complaint, is a

2 legitimate, honest cryptocurrency built on technology I invented and for which I obtained a

3 portfolio of patents, duly examined and issued by the United States Patent Office. The United

4 States government should be thanking me for inventing it rather than attempting to punish me

5 through civil forfeiture. The technology contains innovative biometric capabilities helpful to

6 prevent the types of theft and illicit use of cryptocurrency to which other digital currencies are

7 susceptible. After a reasonable development period during which my company, NAC Foundation,

8 LLC ("NAC"), sold millions of AML Bitcoin Tokens, NAC released the full-featured AML

9 Bitcoin product with our unique security features. That release occurred in April 2020, and users

10 are now able to trade in the full-featured AML Bitcoin. Each of the government's factual

11 allegations of fraud are based on the false premise that AML Bitcoin does not have technology. As

12 the exhibits attached to this motion demonstrate, AML Bitcoin is not a scam and is a legitimate

13 technology.

14   In fact, the events alleged in the Complaint were part of a scheme by disgraced lobbyist

15 and convicted felon Jack Abramoff to extort me into selling my business interests and intellectual

16 property. The "J.D." identified in the Complaint is Japheth Dillman, an associate of Abramoff's

17 whom I hired as a "Chief Strategy Officer" at Abramoff's request. After initially gaining my trust

18 by offering to help my company develop business partnerships with influential United States and

19 foreign politicians, Abramoff attempted to force me to sell my business to a group of his

20 associates for $100 million, as part of which Abramoff would receive a $40 million "finder's fee,"

21 starting in October 2018. Three days after I conclusively turned down Abramoff's offer on August

22 12, 2019, the IRS began its audit of my business. In the next few weeks, Abramoff's business

23 associate David Cohen sent multiple threatening letters indicating that if I did not agree to the

24 deal, the government would commence civil forfeiture proceedings against me and my business in

25 order to destroy my business, which is exactly what has happened by virtue of the government

26 filing its civil forfeiture Complaint. In view of Abramoff's threats and as explained in more detail

27 below, the actions alleged in the Complaint were performed by Dillman to create an artificial and

28 frivolous civil forfeiture claim against me.

**DOJ REFORM**

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1    I served the present motion on the government on June 12, 2020, allowing the government

2   the full 21 days permitted by Fed. R. Civ. P. 11(c)(2) to either withdraw the Complaint or to

3   explain its evidentiary basis for the Complaint. The government did neither. I therefore am filing

4   this motion for sanctions asking the Court to order that the Complaint be dismissed with prejudice

5   as a sanction for the government's failure to produce evidence supporting its Complaint and to

6   conduct a reasonable investigation before filing its Complaint, and that the Court enjoin the

7   government from filing additional civil or criminal complaints against me, my business, or my

8   property without leave of court.

9                    **STATEMENT OF ISSUES PRESENTED**

10   1.    Did the Plaintiff United States conduct a reasonable inquiry under the circumstances and

11   have evidentiary support for its factual contentions before filing the Complaint in this civil

12   forfeiture action?

13   2.    What is the appropriate sanction under Fed. R. Civ. P. 11 for the government's

14   misconduct?

15                        **STATEMENT OF FACTS**

16   A.    **The Invention and Development of AML Bitcoin**

17    Cryptocurrency has developed into a major industry since its invention in 2008 and

18   subsequent creation of the original cryptocurrency, Bitcoin. Cryptocurrencies are, as the Ninth

19   Circuit has described them, "a form of digital currency based on mathematical algorithms that is

20   not controlled by any country, bank, or individual." *United States v. Costanzo*, 956 F.3d 1088,

21   1088 (9th Cir. 2020). Because Bitcoin operated through a distributed system outside the control of

22   governments or banks, and by its design is pseudonymous, many of the early uses of Bitcoin were

23   for illicit transactions. *See* Declaration of Rowland Marcus Andrade in Support of his Motion for

24   Sanctions ("Andrade Decl."), Ex. 4 at 15 (AML Bitcoin Original White Paper). Cryptocurrencies

25   also became attractive targets for hackers and thieves, as hundreds of millions of dollars of

26   Bitcoins were stolen from several companies from 2014-2016. *Id.* at 15-16.

27    In response to the market's need for a more secure cryptocurrency, I developed methods

28   for securing cryptocurrency with biometric data. I began developing cryptocurrency with anti-

5

1  money-laundering (AML) security features in 2012, and formed NAC Foundation, LLC in 2014.

2  Andrade Decl. at ¶ 2. Using some of my proprietary technology, I developed the Aten Coin, a

3  digital currency designed to be compliant with anti-money-laundering and anti-terrorist

4  regulations and to be theft-resistant. Andrade Decl. at ¶ 4, Ex. 4 at 2. NAC officially launched

5  Aten Coin publicly on September 21, 2015, selling about nine million Aten Coins. *Id.* My first

6  compliant digital currency patent was filed in March 3, 2015 in Europe which gives a deep

7  understanding of the technology. Andrade Decl. at ¶ 5. The government has in its possession the

8  original source code for the AtenCoin.

9      I then sought to improve on the Aten Coin with AML Bitcoin, a cryptocurrency with

10  updated protocols still possessing some of the unique biometric and security features I invented. I

11  have obtained seven United States patents on the methods I invented, U.S. Patents Nos. 9,985,964,

12  10,116,657, 10,182,051, 10,298,571, 10,298,572, 10,389,713, and 10,484,178, with other

13  applications still pending, as well as many related patents in other countries; dating back to an

14  earliest filing date in March 2016. Andrade Decl. at ¶ 5. These patents are licensed to NAC for use

15  in the AML Bitcoin system. *Id.* The government has a copy of the licensing agreement. NAC

16  Foundation, LLC also had contracts with several ID Verification companies, such as Jumio Corp.

17  Andrade Decl., Ex. 1. NAC also has and had multiple contracts to provide transaction monitoring

18  for suspicious activity using my technology with, among others, GlobalVision Systems, Inc. and

19  ComplyAdvantage. Andrade Decl., Exs. 2 and 3. NAC also started building its own internal

20  transaction monitoring system called DetectM, and finalized its own ID verification system called

21  the VIN system, which is operational now as part of AML Bitcoin. Andrade Decl. at ¶ 9.

22      While AML Bitcoin was in development, I held an initial coin offering ("ICO") of AML

23  Bitcoin Tokens in October 2017. Andrade Decl. at ¶¶ 10, 12. AML Bitcoin Tokens did not have

24  the intended security features that the AtenCoin had, and that the AML Bitcoin currently has in

25  place. The AML Bitcoin Tokens existed as a placeholder to allow users to begin using NAC's

26  products while AML Bitcoin was in development. Andrade Decl. at ¶ 11, Ex. 5. During the ICO,

27  NAC issued millions of AML Bitcoin Tokens between October 2017 and February 2018, at prices

28  of $1.00 to $1.50 per AML Bitcoin Token. Andrade Decl. at ¶ 12.

DOJ REFORM

1   During the development cycle, I worked tirelessly to get the AML Bitcoin Token listed on

2   public exchanges to allow users to buy and sell openly. I received assurances from public

3   cryptocurrency exchange HitBTC in November of 2017 that AML Bitcoin Tokens would be listed

4   on their exchange in a few months, but that listing got delayed due to concerns about general

5   United States cryptocurrency regulations outside my control. Andrade Decl. at ¶ 13. I paid the

6   listing fees to HitBTC in October 2017. Andrade Decl., Ex. 6. On September 13, 2018, HitBTC

7   began listing the AML Bitcoin Token.

8   I continued developing AML Bitcoin technology throughout 2018 and 2019, making

9   steady progress. Andrade Decl. at ¶ 15. To the extent the launch of AML Bitcoin was delayed,

10  much of that delay was caused by the government's improper investigation into AML Bitcoin. The

11  government (through FBI Agent Rohan Wynar) was aware in 2018 through a recorded call with

12  Richard Naimer (which the government and myself have in our possession,) about the ID

13  Verification System that NAC was funding. Andrade Decl. at ¶ 16. The government then started

14  harassing many AML Bitcoin supporters and financial backers of the project. Andrade Decl. at ¶

15  17. Federal agents then intimidated AML Bitcoin customers to find someone who would support

16  their false narrative that I was somehow involved in fraud. Andrade Decl. at ¶ 17. These agents'

17  investigation and harassment resulted in people quitting the project and mounting legal fees.

18  Although the actions of the agents delayed the AML Bitcoin project, the public beta testing

19  of the AML Bitcoin technology commenced in November 2019. Andrade Decl. at ¶ 19.

20  Information regarding how to operate the AML Bitcoin during the beta test was publicly available

21  through NAC's public YouTube channel, posted on November 26, 2019, at

22  https://www.youtube.com/watch?v=ztwyqpmlSzU. One of the videos uploaded on November 26,

23  2019, titled "How to Verify Your Identity with the Virtual Identity Network (VIN) System

24  Through AMLWallet.com," discusses how to use the identity verification system unique to AML

25  Bitcoin. A list of videos is available at www.amlbitcoinvideos.com. Andrade Decl. at ¶ 19. The

26  video titled "Aten Black Gold Coin System Functionality-- AML BitCoin's Pioneer Coin"

27  includes proof that the Aten Coin technology was completed in August 16, 2015. Andrade Decl. at

28

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

DOJ REFORM

¶ 20. On April 12, 2020, AML Bitcoin launched, and AML Bitcoin Token holders were able to exchange their tokens for AML Bitcoins on a 1:1 exchange basis. Andrade Decl. at ¶ 21.

**B.    The Japheth Dillman/VICTIM ONE AML Bitcoin Token Transactions**

I had a brief business relationship with an individual named Japheth Dillman, whom I believe to be the "J.D." identified in the Complaint, in 2017. Andrade Decl. at ¶ 22. In 2017, famous lobbyist and convicted felon Jack Abramoff came to me offering to help develop AML Bitcoin partnerships with government officials. Andrade Decl. at ¶ 22. As part of his assistance, Abramoff encouraged me to hire Dillman, one of his associates, as a "Chief Strategy Officer." Andrade Decl. at ¶ 23. NAC proceeded to hire Dillman as its Chief Strategy Officer in a letter dated September 24, 2017. Andrade Decl., Ex. 10. His duties were not to sell AML Bitcoin Tokens, but to generate publicity and marketing strategies including a developing partnership with the Port of San Francisco, foreign governments, and Silicon Valley tech companies. *Id.* at Addendum A. He never performed those duties, and I later terminated his involvement with the project in December 2018. Andrade Decl. at ¶ 24.

In January 2018, a company named Block Bits Capital, LLC ("Block Bits") owned by J.D., Jack Abramoff, and their associates, purchased AML Bitcoin Tokens directly from NAC as part of the initial sale (the ICO) of AML Bitcoin Tokens. Distribution statements show purchases of AML Bitcoin Tokens for Block Bits Capital LLC. *Compare* Andrade Decl., Ex. 11 to Complaint at ¶ 10. I never knew that "VICTIM ONE"—an individual I now know to be Benjamin Boyer—was the source of the funds. Andrade Decl. at ¶ 26. Dillman's own email to me regarding the purchase states that Block Bits is the purchaser and never mentions Boyer/VICTIM ONE. Andrade Decl., Ex. 12. I only learned of Boyer's involvement in October of 2018 when Block Bits contacted me and brokered the purchase of AML Bitcoin Tokens through a purchase agreement where Boyer/VICTIM ONE and I never spoke. Distribution Statements for Block Bits indicate that the transactions referred to in the Complaint were payments from Boyer to Block Bits, not to NAC. Andrade Decl., Ex. 16. The corresponding transactions strongly indicate that the individual identified in the Complaint as "VICTIM ONE" is Benjamin Boyer.

DOJ REFORM

1   In order to make each purchase of AML BitCoin Tokens directly from me in October

2   2018, Boyer had to read and agree to the terms and conditions listed on AML BitCoin's website

3   prior to downloading a digital currency wallet (Dkt. No. 18, Ex. J), and sign a purchase agreement

4   setting out the terms of the sale (Andrade Decl., Ex. 17). I never made any representations to

5   Boyer about what he was buying because I never spoke to him. Andrade Decl. at ¶ 32.

6   On June 9, 2019, Boyer revealed to me that he had an agreement between himself and

7   Dillman. They created Block Bits AML Holdings which was a Delaware Limited Liability

8   Company formed by an agreement effective January 11, 2018. Andrade Decl., Ex. 21. Though the

9   copy of the Block Bits AML Holding Company Agreement in my possession does not include an

10  identification of the members, it does state that Dillman is the "partnership representative"

11  authorized to represent Block Bits. Andrade Decl., Ex. 21 at Section 9.9. I do not know the exact

12  membership of Block Bits AML Holdings, other than that Dillman was the Managing Director &

13  Founder, and that Boyer contributed the capital to purchase AML Bitcoin Tokens. I do know,

14  however, that Abramoff and his associates had set up a related company, Block Bits Fund I, L.P.,

15  that was funded in large part by Abramoff, his associates, and his shell company Landfair Capital

16  Consulting, Inc. Dkt. No. 31, Ex. G.

17  Dillman informed me on January 14, 2018, that Block Bits Capital, LLC (a separate

18  company from Block Bits AML Holdings, of which Boyer was a member) intended to put in an

19  order for $50 million of AML BitCoin, and was sending an initial wire of $850,000 as part of that

20  purchase. Andrade Decl., Ex. 12. After purchasing over $1.4 million in AML Bitcoin Tokens

21  through Block Bits Capital as purchaser, as part of the ICO in January 2018, Dillman informed me

22  that Block Bits Capital was unable to raise and invest the remainder of the intended $50 million.

23  Andrade Decl., Ex. 14. In his letter notifying me of the inability to complete the $50 million

24  purchase, Dillman makes no reference to the fact that he and Boyer created Block Bits AML

25  Holdings, and in fact makes no reference to Boyer at all. *Id.*

26  Boyer later told me in mid-2019 that a few months earlier, in late 2018, the government

27  told him that AML Bitcoin was a scam. Andrade Decl., Ex. 22. Instead of contacting me directly

28  about the government's allegations, he contacted Dillman and fellow Block Bits AML Holdings

9    Case No. 3:20-cv-2013-VC

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 11(C)

1  member David Mata. Andrade Decl. at ¶ 38. Dillman then entered into an agreement with Boyer

2  to buy him out without my knowledge. Andrade Decl. at ¶ 39. According to their agreement, the

3  buyout was supposed to happen on January 9, 2019. Andrade Decl. at ¶ 39.

4      Dillman and Boyer then had an apparent falling out. Dillman had agreed to purchase the

5  AML Bitcoin Tokens in Block Bits AML Holding's possession (which included more than just the

6  January 2018 purchases) for about $3 million. Andrade Decl. at ¶ 40. As discussed previously, the

7  purchases of the tokens from NAC's position were from Block Bits Capital and not from Block

8  Bits AML Holdings, their equity fund. Andrade Decl. at ¶ 40. I knew nothing about the equity

9  fund or who was involved with it. Andrade Decl. at ¶ 43. However, Dillman failed to pay Boyer

10  any of the promised money for the tokens. Andrade Decl. at ¶ 40. Boyer accordingly filed a

11  lawsuit against Dillman for breach of contract in the Superior Court of California for the County

12  of San Francisco on April 10, 2019, Case No. CGC-19-575158. Andrade Decl., Ex. 23. Dillman

13  never responded to that complaint, and Boyer obtained a default judgment against Dillman for

14  $3,103,674.63 on June 19, 2019.  Andrade Decl., Ex. 24.

15      Around late November 2018, I found out that Dillman and his partner David Mata were

16  allegedly making false misrepresentations to people when brokering the sale of AML Bitcoin

17  Tokens. Andrade Decl. at ¶ 33. When I learned of this issue in late 2018, our compliance attorney

18  Chris Ray reached out to Boyer, Dillman, and Mata. Andrade Decl. at ¶ 33. Ray sent Boyer an

19  email asking him to contact Ray. Andrade Decl., Ex. 18. My staff followed up on that email to

20  inform Boyer that Ray's job was to ensure that all the information he received from his client

21  representative was true and accurate. Andrade Decl., Ex. 18. Shortly thereafter, David Mata, now

22  representing himself as the Managing Director of Block Bits Capital, informed me that Boyer had

23  already sold his AML Bitcoin Tokens to Dillman, and so would likely not respond to me or Ray.

24  *Id.*; *see also* Andrade Decl., Ex. 19. As a result of the information I learned from Mata and Ray

25  indicating that Mata and Dillman may have made false representations to Boyer, I tried to get

26  ahold of Boyer to offer him a full refund of his direct purchases in December of 2018 and in

27  January 2019, and informed Mata and Dillman that I would no longer do any business with Block

28

DOJ REFORM

Case No. 3:20-cv-2013-VC

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1  Bits. Andrade Decl., Ex. 20. Neither Mata, Dillman, nor Boyer responded to that email for

2  months. Andrade Decl. at ¶ 35.

3       In May 2019, after Boyer filed his lawsuit against Dillman but before he obtained his

4  default judgment, Boyer responded to me to say that Dillman had instructed him in

5  November/December of 2018 <u>not to talk to me or anyone from NAC</u>. Andrade Decl., Ex. 25.

6  Boyer asked in the email what J.D.'s role was with AML Bitcoin and what the state of AML

7  Bitcoin's development was. *Id.* I explained that I had previously tried to reach out to him, and

8  would be willing to arrange a call with him through legal counsel to discuss these issues. *Id.*; *see*

9  *also* Andrade Decl., Ex. 25. Boyer only reached out to me after Dillman violated his agreement by

10  failing to pay Boyer as he had promised.  I was not a part of and had no knowledge of what was

11  going on between Boyer, Dillman, and Mata.

12  **C.**    <u>**Jack Abramoff and His Associates' Extortionate Scheme**</u>

13       In 2018, I started to get concerned about Jack Abramoff's and Dillman's false promises.

14  Dillman contacted me again in around March or April of 2018 and told me he could get the $50

15  million dollar AML Bitcoin Token purchase deal back but he needed to be compensated for his

16  time. Andrade Decl. at ¶ 44. Specifically, Dillman asked me to pay him a percentage of what

17  Block Bits Capital, LLC purchased in AML Bitcoin Tokens. Andrade Decl. at ¶ 44. After I

18  refused to agree to that deal or pay his demanded percentage, Dillman continuously sent invoices

19  over to me and my CPA. Andrade Decl. at ¶ 45. The invoices were from a different company

20  name I had never saw before, called Janga. Andrade Decl. at ¶ 45. I continued to refuse to make

21  Dillman's demanded payments. Andrade Decl. at ¶ 45.

22       Jack Abramoff then contacted me and told me that Dillman was going to set up a meeting

23  between me and the Port of San Francisco commissioner Leslie Katz, and California's Lieutenant

24  Governor Gavin Newsom. Andrade Decl. at ¶ 46. The meeting with Lt. Governor Newsom

25  occurred on April 26, 2018. Andrade Decl., Ex. 26. Abramoff and Dillman informed me that a

26  deal was in progress with the Port of San Francisco. Andrade Decl. at ¶ 47.  Abramoff insisted that

27  unless I pay Dillman the money he requested, that nothing would be done with the governor and

28  nothing with the Port. Andrade Decl. at ¶ 47. I was informed the State of California wanted to

Case No. 3:20-cv-2013-VC

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

DOJ REFORM

1  utilize our technology so they could start taxing marijuana (which had been legalized by the State

2  of California for recreational use starting January 1, 2018, but remains illegal under federal law),

3  and needed the AML Bitcoin technology because the federal government could crack down on

4  FDC supported banks. Andrade Decl. at ¶ 48. The meeting with the Port of San Francisco took

5  place on Friday April 27th, 2018. Andrade Decl., Ex. 27. Then, on April 28th, 2018, I had another

6  conversation with Abramoff, in which he persuaded me to pay Dillman or I would lose the deal

7  with the Port of San Francisco, various other ports in California, and with the State of California.

8  Andrade Decl. at ¶ 50. I paid Dillman 450 ethereum (at an approximate market value of $680 per

9  ethereum around April 28, 2018, for a total value of around $300,000), knowing he had just put

10  me in front of the soon to be elected Governor. Andrade Decl. at ¶ 50. Interestingly, David Mata

11  called me weeks later  he hesitantly told me he wanted a percentage of what BlockBits brought in

12  as well. Andrade Decl. at ¶ 51. I told Mata I already paid it. Andrade Decl. at ¶ 51.

13       Around December of 2018, my relationship with Jack Abramoff began to deteriorate. By

14  that point, I had been in discussions with him for almost 2 years in which he made many promises

15  concerning contacts he could make for me, but he never delivered results. Andrade Decl. at ¶ 52.

16  Things got worse when I loaned Richard Naimer, a very close associate of Jack Abramoff, over

17  $700,000 in the fall of 2018 in consideration of receiving shares in his company, DIT Network.

18  Andrade Decl. at ¶ 52. Naimer refused to pay me back or give me my shares in the company.

19  Andrade Decl. at ¶ 52. Naimer hired an attorney to draft a formal loan agreement between his

20  entity, DIT, and my company, NAC, memorializing the terms of the loan. Andrade Decl., Ex. 28.

21  When it became evident that Namier wouldn't be making his payments, I broke off business

22  relations with him. Andrade Decl., Ex. 29.

23       After that, Abramoff and Naimer demanded that I sign over the rights to my technology

24  in order for me to receive the shares in DIT Network I was already entitled to. In January 2019, I

25  was woken up around 5.a.m with a call from Naimer, and he told me that the agreement had to be

26  signed and sent back at that very moment knowing I was up working until around 3 a.m. Andrade

27  Decl. at ¶ 54, Ex. 30. Throughout the rest of 2019, Jack Abramoff continued in his efforts to extort

28  me of my technology by making his contacts in my network threaten me in order to convince me

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

DOJ REFORM

1  to agree to give him a 40% brokerage fee for selling my technology to an undisclosed buyer. Jack

2  Abramoff also contacted J.D. and his partner David Mata.

3       These demands culminated in threats that if I did not agree to Abramoff's deal, civil

4  forfeiture actions would be brought against me and my company. As explained previously in my

5  Motion to Preserve Evidence (Dkt. No. 31), shortly after I refused Abramoff's offer, his associate

6  David Cohen sent an email on August 20, 2018, threatening that if I passed on the deal, "you can

7  imagine on your own the possible bad outcomes several of which I have listed at the bottom of

8  this email in blue." Dkt. No. 31 at 4. The bad outcomes listed included civil forfeiture actions

9  brought against me and my company. *Id.* In case that threat were not clear enough, Cohen sent

10  another email eight days later threatening more explicitly that if I did not accept the deal, the

11  government would begin an asset forfeiture proceeding against me, and the business would be

12  dead. *Id.*

13                              **ARGUMENT**

14       Federal Rule of Civil Procedure 11 requires that a person, by presenting to the court a

15  complaint or other pleading and signing that pleading, certify that "to the best of the person's

16  knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . .

17  . the allegations and other factual contentions have evidentiary support or, if specifically so

18  identified, are likely to have evidentiary support after a reasonable opportunity for further

19  investigation or discovery." When a complaint is the focus of Rule 11 proceedings, the Court

20  "must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually

21  'baseless' from an objective perspective, and (2) if the attorney has conducted 'a reasonable and

22  competent inquiry' before signing and filing it." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127

23  (9th Cir. 2002).

24       Here, the evidence presented below demonstrates that the government did not have

25  evidentiary support for the key factual allegations in the Complaint, and could not have conducted

26  a "reasonable and competent inquiry" before filing the Complaint; and the law enforcement

27  agencies deliberately withheld exculpatory evidence from the Department of Justice attorney Chris

28  Kaltsas. Had the government conducted a reasonable and competent inquiry of me, AML Bitcoin,

---

13

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

DOJ REFORM

1  and the NAC Foundation, it could not have believed that the allegedly fraudulent statements made

2  that "the cryptocurrency was under development; that millions of tokens representing the

3  cryptocurrency had been successfully sold; and that [VICTIM ONE's] funds would be used to

4  further the development of the cryptocurrency" were false; that AML Bitcoin's development was

5  "minimal and not progressing;" that "[t]o date, [I] and the NAC have not made any meaningful

6  progress towards developing AtenCoin, AML Bitcoin, or ABTC," or that any other statement

7  alleged to be fraudulent by the Complaint was in fact fraudulent. Dkt. No. 1 at ¶¶ 9, 11, 16.

8  **A.**    **There is no evidentiary basis for the government's claims that the allegedly**

9          **fraudulent statements in the Complaint are false**

10         The Complaint primarily alleges that I and/or my associates, primarily "J.D." (presumably

11  Dillman), induced "VICTIM ONE" (presumably Boyer) to invest in my cryptocurrency project

12  through fraudulent statements, and thus that I committed, or at least benefitted from, wire fraud

13  under 18 U.S.C. § 1343. The Complaint alleges that either I or J.D. made the following

14  supposedly fraudulent statements:

15  •    Undefined "materially false and misleading statements regarding the status of the
          development of the cryptocurrency and the use of funds raised from investors." Complaint,
16        ¶ 9.

17  •    Undefined "false statements regarding business arrangements that [I] and [my] associates
          had purportedly made with government agencies and ports, falsely leading investors to
18        believe [my] and [my] associates' statements about the prospects of the AML Bitcoin
          cryptocurrency." Complaint, ¶ 9.
19
     •    Statements made by J.D. in or around January 2018 that "the cryptocurrency was under
20        development." Complaint, ¶ 11.

21  •    Statements made by J.D. in or around January 2018 that "millions of tokens representing
          the cryptocurrency had been successfully sold." Complaint ,¶ 11.
22
     •    Statements made by J.D. in or around January 2018 that VICTIM ONE's "funds would be
23        used to further the development of the cryptocurrency." Complaint, ¶ 11.

24  •    Statements made by me in or around January 2018 that "the launch of the cryptocurrency
          was months away, notwithstanding that at the time of the statements development were
25        [sic] minimal and not progressing." Complaint, ¶ 11.

26  The government also alleges, underlying its claims that the above statements are fraudulent, that

27  "To date, [I] and the NAC have not made any meaningful progress towards developing AtenCoin,

28  AML Bitcoin, or ABTC." Complaint, ¶ 16.

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1    The elements of wire fraud under 18 U.S.C. § 1343 are: "(1) the existence of a scheme to

2  defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to

3  defraud." *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013). A "scheme to defraud," under

4  the wire fraud statute, is a "scheme to deprive another of money or property by means of false or

5  fraudulent pretenses, representations, or promises." *United States v. Brugnara*, 856 F.3d 1198,

6  1207 (9th Cir. 2017). Thus, if the representations the government alleges that I or J.D. made in

7  furtherance of the alleged "scheme to defraud" are in fact true, there can be no "scheme to

8  defraud," and thus no wire fraud.

9    1.    **The alleged statements made regarding development of AML Bitcoin were**

10    **true.**

11    AML Bitcoin was under development and making progress throughout 2018 and 2019,

12  resulting in its full-featured launch in April 2020. Andrade Decl. at ¶¶ 15, 21. The software

13  development for AML Bitcoin was not trivial, and over those two years our company made steady

14  progress. Andrade Decl. at ¶ 15. To the extent there were delays, much of them were caused by

15  the government investigation and interference in the business. Andrade Decl. at ¶¶ 15-17. AML

16  Bitcoin did suffer a lot of financial setbacks as a result of this 2 year investigation, including over

17  $2 million dollars in expenses, fees, attorneys' fees and debts. Andrade Decl. at ¶ 17.  We lost our

18  major developer Hung Tran of two years because the government investigation scared him into

19  quitting in early 2019. Andrade Decl., ¶ 17, Ex. 9. Still, NAC's public YouTube channel

20  documents some of the improvements made over that time. In June 2018, AML Bitcoin Tokens

21  were listed on several public digital currency exchanges, and a series of videos explains how to

22  use each of those exchanges to trade AML Bitcoin. Andrade Decl. at ¶ 18. In 2017 to 2019 , NAC

23  was funding an ID Verification system that was going to be integrated into AML Bitcoin. Andrade

24  Decl. at ¶ 9. The government knew this when they spoke to Richard Naimer in 2018 on a recorded

25  call and he told them I was spending a few hundred thousand dollars each month in expenses

26  towards developing biometric identification software. Andrade Decl. at ¶ 16.

27    In November 2019, the AML Bitcoin technology was ready for public beta testing;

28  meaning the public could participate in its testing. Andrade Decl. at ¶ 19. And in April 2020, AML

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

DOJ REFORM

1   Bitcoin was ready for public launch. Andrade Decl. at ¶ 21. All this information, except for the

2   April 12, 2020 launch date, was publicly available and documents pertaining to such was in the

3   governments hands prior to them filing the Compliant. The finalized Aml Bitcoin is now listed on

4   Lbank Exchange. Andrade Decl. at ¶ 21.

5        The government's allegations that no development was occurring or had occurred are thus

6   demonstrably false, as are the allegations that statements made regarding the development status

7   of AML Bitcoin were fraudulent. The Complaint alleges that I and J.D. both made fraudulent

8   statements to VICTIM ONE that that AML Bitcoin was under development and near launch, when

9   development was minimal and not progressing at the time. Complaint at ¶¶ 11, 16. As discussed

10  above, the cryptocurrency was under development, and NAC had made meaningful progress

11  towards developing AML Bitcoin, resulting in public listings of AML Bitcoin Tokens back in

12  2018 and the listing of the AML Bitcoin on June 12, 2020.

13       For that matter, the specific allegation of paragraph 16 of the Complaint that I and NAC

14  have "not made any meaningful progress towards developing AtenCoin, AML Bitcoin, or ABTC,"

15  is so clearly wrong that it demonstrates the government could not possibly have made a reasonable

16  inquiry into the allegation. NAC's White Paper for AML Bitcoin, dated October 4, 2017, and

17  publicly available on NAC's website at https://amlbitcoin.com/white-paper/, explains that Aten

18  Coin launched on September 21, 2015, and about 9 million Aten Coins were sold. Andrade Decl.,

19  Ex. 4 at 2. Since 2018, the government has proof the Aten Coin was a legitimate project.

20       One alleged false statement in the Complaint is that I represented that "the launch of the

21  cryptocurrency was months away." Complaint at ¶ 11. At no point in January 2018 (the time of

22  Boyer's investment into Dillman's fund), did I ever represent to anyone that the full-featured

23  AML Bitcoin launch would be months away. I did, however, state that we were "months" away

24  from being able to begin testing of the AML Bitcoin. Andrade Decl. at ¶ 15. NAC did issue press

25  releases in December 2017 that AML Bitcoin Token's listing on HitBTC, one of the world's

26  largest digital currency exchanges, was months away, based on communications with HitBTC

27  indicating that it would be listed in January 2018. Andrade Decl., Ex. 7. HitBTC backed away

28  from the listing at that time for reasons outside NAC's control, but did eventually list AML

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1    Bitcoin Tokens in September 2018. Andrade Decl., Ex. 8. There was no fraudulent statement or

2    scheme to defraud, only normal adverse events, many of which are often beyond one's control,

3    that can affect any new business.

4           2.      **The allegedly fraudulent statements regarding the use of VICTIM ONE's**

5                   **funds are disproven by the contracts governing his AML Bitcoin Token**

6                   **purchases.**

7           In order to access NAC's website or purchase AML Bitcoin Tokens, or download the

8    AML Bitcoin Wallet to hold the digital currency, VICTIM ONE/Boyer had to read and agree to

9    the site's Terms and Conditions and sign a Purchase Agreement. Dkt. No. 18, Exs. J, N. The

10   Terms and Conditions explain clearly that AML Bitcoin and AML Bitcoin Tokens are unsecured

11   cyber currencies, not investments, securities, debt instrument, or any other form of asset that

12   would entitle VICTIM ONE to have a say in how his funds were used. Dkt. No. 18, Ex. J at ¶¶ 10-

13   18. The same Terms and Conditions require a user to agree that "[i]n making Your purchase of

14   AML BitCoins and/or AML BitCoin Tokens You are and have relied solely upon Your own

15   judgment, belief and knowledge as to the nature of the currency and the Cybercoin,

16   cryptocurrency, or digital market and industry and You are not relying on any statements made by

17   NAC, or any of its agents or representatives or on any of its advertising or marketing materials, or

18   any representation or statement made on any NAC Website." *Id.* at ¶ 41. The Purchase Agreement

19   that Boyer signed includes the same provisions. Andrade Decl., Ex. 17 at ¶¶ 3.j-3.r.

20          VICTIM ONE/Boyer, therefore, could not possibly have been defrauded by being told

21   orally (allegedly by J.D./Dillman) that that his funds would be used to further AML Bitcoin's

22   development as alleged by Paragraph 11 of the Complaint. Under Nevada law, which governs the

23   Purchase Agreements of AML Bitcoin Tokens (*See* Andrade Decl., Ex. 17 at ¶ 13), claims for

24   fraudulent inducement cannot be based on an alleged fraud that conflicts with the contract's

25   express terms, "as the terms of the contract are the embodiment of all oral negotiations and

26   stipulations." *Road & Highway Builders v. N. Nev. Rebar*, 284 P.3d 377, 381 (Nev. 2012). If

27   Boyer believed that by purchasing AML Bitcoin Tokens, he was investing in AML Bitcoin's

28   development, the contracts he signed to purchase AML Bitcoin Tokens should have informed him

DOJ REFORM

1  otherwise. As a matter of law, there can be no fraud based on Dillman's alleged statement

2  suggesting Boyer's purchase was an investment, when Boyer signed contracts clearly stating that

3  it was not.

4          Nevertheless, even if Boyer failed to read the contract before signing it, my actions upon

5  realizing what J.D. had done make it clear that there was no scheme to defraud. As stated in the

6  affidavit from my compliance attorney, he reached out to Boyer to determine if Dillman had made

7  statements suggesting that AML Bitcoin Tokens were an investment or security, and offered to

8  refund his tokens upon confirming if there had been a possible misunderstanding between Boyer

9  and Block Bits Capital. Andrade Decl. at ¶ 35. There can be no "scheme to defraud" where I

10  offered to refund Boyer's money as soon as I learned there was even a possibility that Dillman had

11  allegedly defrauded Boyer. <u>Furthermore, there can be no scheme to defraud when I tried to reach</u>

12  <u>out to him, but was prevented from communicating with Boyer by Dillman and Mata.</u>

13      3.      **<u>The allegedly fraudulent statements made regarding business arrangements</u>**

14              **<u>with governments and ports were true to my knowledge, not fraudulent.</u>**

15          In 2017 and 2018, NAC was involved in active discussions with governments and ports

16  regarding the use of NAC's secure blockchain technology. For example, on April 27, 2018, I, J.D.,

17  and Richard Naimer (the CEO of the digital identification company with which NAC funded and

18  worked on the biometric identification feature) met with Leslie Katz, Elaine Forbes, and Byron

19  Rhett, the Commissioner, Executive Director, and Chief Operating Office, respectively, of the Port

20  of San Francisco. Andrade Decl., Ex. 27. At that meeting, we discussed potential implementation

21  of blockchain based identification and tracking for passengers and cargo, use of CrossVerify for

22  the port's Transportation Worker Identification Credential, and adoption of CrossVerify by cruise

23  ship operators that could be integrated with immigration and security authorities. *Id.* We discussed

24  how the AML Bitcoin could be of assistance to the port. Katz had worked with me, J.D., and now-

25  infamous lobbyist Jack Abramoff extensively to introduce NAC to United States and foreign

26  government officials who might be interested in using NAC's technology. As a matter of fact,

27  Abramoff even put us in touch with high ranking people at the Department of Treasury.

28

DOJ REFORM

1    Therefore, the alleged "false statements regarding business arrangements that [I] and

2    [my]associates had purportedly made with government agencies and ports," without more detail,

3    lack any evidentiary basis. NAC had business arrangements with U.S. and foreign government

4    agencies and ports in January 2018. Absent any greater detail, the allegation that general

5    statements regarding business arrangements between NAC and government agencies and ports

6    were false lacks any evidentiary basis. We never told anyone that the deals were finalized, only

7    that we were working towards a contract until the government stepped in and sabotaged it.

8    Additionally, until Jack Abramoff pulled the plug on everything. Again, these allegations cannot

9    support a scheme to defraud.

10    In sum, the government cannot possibly have an evidentiary basis, formed after an inquiry

11    reasonable under circumstances, to believe that any of the allegedly false statements contained in

12    the Complaint were in fact false or part of a scheme to defraud. Without fraudulent statements,

13    there is no evidentiary basis for the government's allegations of wire fraud or money laundering

14    predicated on that wire fraud, and the Complaint is baseless.

15    **B.**    **There is no evidentiary basis specifically for any scheme to defraud VICTIM ONE**

16    **based on undisputed evidence that has been known to the government.**

17    "[T]he crime of wire fraud requires the specific intent to utilize deception to deprive the

18    victim of money or property, i.e., to cheat the victim." *United States v. Miller*, 953 F.3d 1095,

19    1099 (9th Cir. 2020). The only evidence in this case shows plainly that I had no intent to cheat

20    VICTIM ONE/Boyer with respect to his purchase of AML Bitcoin Tokens. Dillman's alleged

21    actions were not mine. We made various attempts to contact him and he was told not to contact us.

22    I never spoke directly to Boyer regarding his initial purchase of AML Bitcoin Tokens. I

23    never knew about the company Block Bits AML Holdings (the equity fund) which both J.D. and

24    Boyer were a part of until long after Block Bits AML Holdings made its purchases. Andrade Decl.

25    at ¶¶ 36, 43. Nor did I authorize Dillman to make any statement to induce Boyer or anyone to

26    purchase AML Bitcoin Tokens; Dillman's only role at NAC concerned general business

27    development, not sale of AML Bitcoin Tokens. Andrade Decl. at ¶ 23, Ex. 10.

28

DOJ REFORM

As soon as I learned that there was a possibility that some purchasers of AML Bitcoin Tokens may have been misled by Dillman and his partner David Mata, my compliance attorney Chris Ray and I immediately tried to contact Boyer. Andrade Decl., Ex. 13. Ray personally called every purchaser of AML Bitcoin Tokens to ask a series of questions regarding the nature of the Tokens, and ensured that each understood that the Tokens were a medium of exchange, not the final product that would feature anti-money-laundering and know-your-customer features, and were not tied to any physical, financial, or other asset and did not constitute an investment or security. *Id.* at ¶ 5. Upon learning that Block Bits had misled one purchaser, Daniel Aharanoff in October and November of 2018, NAC immediately offered to refund Aharanoff's purchase and investigated further into other Block Bits brokered purchases. *Id.* at ¶ 7. Aharanoff was provided with the correct information and decided against a refund. Ray then attempted to reach out to Boyer repeatedly in November and December 2018, but Boyer never answered his calls—and as it turned out, Dillman had instructed Boyer to not speak to Ray. *Id.* at ¶ 9; Dkt. No. 18, Ex. O. I informed Mata and Dillman that because Block Bits had apparently made false representations to Boyer, he was entitled to a full refund for his direct purchases. Andrade Decl., Ex. 20. But Mata had informed me that because he and Dillman had bought out Boyer's Tokens, there was nothing to refund.

These communications refute any allegation by the Government of a specific intent to deceive. A person who intended to cheat VICTIM ONE/Boyer would have lied to him initially, then refused to offer any refund or attempt to clarify any miscommunication. I did the exact opposite; I never lied to Boyer, and as soon as I found out his purchases may have been induced by false statements from his apparent partners at Block Bits AML Holdings, I told Dillman and David Mata that he may need to be refunded, and my compliance attorney and I tried to contact him. It is not our fault that he ignored us and according to his own admissions, Dillman told him to ignore us. We made multiple attempts to reach Boyer knowing Dillman and his partner David Mata told us he was bought out already. It is Boyer's own fault, or at most Dillman's, that Boyer sold his tokens to Dillman and totally ignored me during that period.

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 11(C)

1    If the government's theory is that Block Bits defrauded Boyer rather than NAC, the

2  government is also well aware that I was not partners with Block Bits, Dillman, Mata, or

3  Abramoff. The government has copies of correspondence between these parties and myself where

4  they invited me to join their organization, including buying into Block Bits Capital because they

5  believed in the longevity of my digital currency. Andrade Decl., Ex. 15. However, the government

6  is also aware that I turned them down repeatedly, never joined their company, and never created

7  any type of joint venture. Andrade Decl. at ¶ 29.

8  **C.**   **There is no evidentiary basis for the Complaint's allegations that the Defendant**

9        **Property was purchased with proceeds from fraud, or as part of a money laundering**

10       **scheme.**

11   None of the transfers of funds alleged in the Complaint were illegal. VICTIM ONE

12  deposited $1,105,000 from his personal and trust bank accounts into the Block Bits Capital

13  account in January 2018 and he had an agreement with a different company J.D. controlled called

14  Block Bits AML Holdings. Complaint at ¶ 10. Block Bits used that money to purchase AML

15  Bitcoin Tokens, and made that purchase by transferring the money to the "DSA account."

16  Complaint at ¶ 12. The "DSA account" is an account named "David Salmon & Associates, Inc.

17  Client Trust Account for NAC Foundation;" it is an attorney-client trust account that was used to

18  hold money received from thousands of AML Bitcoin Token purchasers and it was held in his

19  escrow pending the tokens holders actually receiving what they paid for. This means David

20  Salmon would not release any of the funding that came in online until he received confirmation

21  from a CPA that the purchaser had received their tokens. During the ICO, there were thousands of

22  transactions. Andrade Decl., ¶ 27.  Once the purchases cleared, the money was transferred out of

23  escrow—a transfer that I had no authority to approve, and the Complaint notably does not allege

24  that I had any authority to approve—into NAC's payroll account only after the CPA confirmed

25  with the attorney that the people who purchased the digital currency indeed received what they

26  paid for. Andrade Decl. at ¶ 27, Ex. 13; Complaint at ¶ 12. From there, NAC paid me for my

27  services as owner and CEO of NAC by transferring money—not VICTIM ONE's money

28

**DOJ REFORM**

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1  specifically—to Fintech Fund Account and then to my personal account to pay for the company's

2  past debts to me.

3      The government cannot plausibly claim that its allegation of money laundering under 18

4  U.S.C. § 1956(a)(1)(B)(i) is warranted by existing law or a nonfrivolous extension of existing law,

5  or that the factual allegations supporting a claim for money laundering have any evidentiary basis.

6  To prove a claim for money laundering, the government must prove four elements: (1) that I

7  knowingly conducted a financial transaction; (2) that I **must know** that the transaction involved

8  property which represented the proceeds of some form of **unlawful activity**; (3) the transaction

9  involved property which was in fact the proceeds of unlawful activity (here, wire fraud); and (4) I

10  engaged in the transaction with the intent to **conceal or disguise** the nature, location, source,

11  ownership, or control of property which was proceeds from the wire fraud. *See United States v.*

12  *Knapp*, 120 F.3d 928, 931 (9th Cir. 1997) (emphasis added). As discussed above, the evidence

13  available clearly shows that I did not obtain VICTIM ONE/Boyer's payments through wire fraud.

14  The evidence also shows that even if J.D./Dillman did fraudulently induce VICTIM ONE  to make

15  any payments, I did not know that any of those payments were obtained through fraud (because to

16  the extent any fraud occurred, it was done by Dillman without my knowledge, and I offered to

17  refund to Boyer any money obtained as a result of Dillman's misconduct when it came to the

18  direct purchases in which Block Bits Capital brokered with myself). I tried along with my

19  compliance attorney to contact Boyer and he willfully ignored us. Boyer admitted that he was told

20  by Dillman not to contact us and we were told not to contact him even though we still made

21  various calls and email attempts to. But even if the money had been the proceeds of wire fraud,

22  nothing in the Complaint suggests that any of the transactions alleged in paragraphs 10-15 of the

23  Complaint were intended to conceal or disguise those proceeds. All the transactions went through

24  ordinary commercial banks, and followed the ordinary course of how money flows from sales

25  receipts to services provided to profits paid to an owner as in any business.

26      The government also cannot plausibly claim that the defendant property is derived from

27  proceeds traceable to a violation of the wire fraud statute under 18 U.S.C. § 981(a)(1)(C). The

28  evidence shows that Boyer received valuable AML Bitcoin Tokens in exchange for his payment,

DOJ REFORM

1    and so the proceeds from his payments could not be proceeds of wire fraud. Boyer sold all his

2    AML Bitcoin Tokens to Dillman in or around December 2018, about 2.56 million, for a total price

3    of about $2.99 million according the lawsuit filed by Boyer. Boyer now has a default judgment

4    against J.D. for the $2.99 million he was never paid plus interests and costs, a total of about $3.08

5    million. Andrade Decl., Ex. 23. Boyer received, or was supposed to receive, value for his AML

6    Bitcoin Tokens, and so was not a victim of any of the alleged fraudulent acts in the Complaint. He

7    may have been a victim of Dillman's fraud in December 2018, but nothing in the Complaint

8    alleges that I or my property were involved in that fraud. The government cannot confiscate my

9    property based on J.D./Dillman's defrauding of VICTIM ONE/Boyer in connection with an AML

10   Bitcoin Token transaction downstream of Boyer's purchase of legitimate AML Bitcoin Tokens in

11   January 2018.

12   **D.    <u>The government should be sanctioned, and the appropriate sanction is dismissal with</u>**

13   **<u>prejudice, enjoining the government from filing additional actions against me without</u>**

14   **<u>leave of court, and an appropriate monetary award.</u>**

15   As explained above, all the evidence in the record shows that AML Bitcoin is a legitimate

16   business, that AML Bitcoin was not involved in any scheme to defraud VICTIM ONE or anyone

17   else, and that the only way in which VICTIM ONE may have been a victim was in relation to his

18   December 2018 transaction with J.D. for which he has already obtained a default judgment.

19   The government knew all this information, and still filed its Complaint seeking forfeiture

20   of my personal residence in the middle of the COVID19 pandemic. Nothing in the Complaint

21   explains why the government waited until March 12, 2020, over two years, to attempt to seek civil

22   forfeiture. All the alleged events in the Complaint took place between January 12, 2018, when

23   VICTIM ONE purchased his AML Bitcoin Tokens, and May 10, 2018, when I purchased my

24   home. Complaint at ¶¶ 10-15. Going outside the complaint, VICTIM ONE/Boyer entered into his

25   transaction with J.D./Dillman in December 2018, and my compliance attorney and I tried to

26   contact VICTIM ONE/Boyer  to see if he was misled by Block Bits Capital between December

27   2018 and May 2019. The government knew all the relevant facts, knew it had no case, but still

28   waited until the moment it could most damage me—in the middle of a national panic, right as the

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1  full-featured AML Bitcoin was about to launch. Additionally the government seized my financial

2  accounts and more on another sworn affidavit, telling the U.S Magistrate in Texas that the whole

3  AML Bitcoin project was a fraud and as result were able to freeze up to millions of dollars and not

4  just the amounts stated on the complaint without providing any explanation or court documents for

5  the seizure. Andrade Decl., Ex. 31.

6        The government has no excuse for its factual inaccuracies. All the information regarding

7  the launch of Aten Coin, the ICO of AML Bitcoin Tokens, and the public's participation in the

8  testing in 2019 up to April of 2020 until the  full-featured AML Bitcoin launched. This has been

9  publicly available at the AML Bitcoin website and NAC's YouTube page. The terms and

10 conditions for AML Bitcoin Token sales that tell purchasers exactly what they are purchasing are

11 publicly available on the AML Bitcoin website. The government was provided with over 80,000

12 documents in response to a subpoena, which caused me to incur over $300,000 in attorney's fees.

13 Andrade Decl. at ¶ 17. The Boyer-Dillman lawsuit was a matter of public record in the Superior

14 Court of California, County of San Francisco, and nevertheless the government would have

15 learned of the lawsuit through Boyer and Dillman who presumably are cooperating. VICTIM

16 ONE/Boyer has admitted that he had been in contact with the government on multiple occasions.

17 The government surely knew about the Boyer-Dillman lawsuit. No reasonable inquiry under the

18 circumstances could have allowed the government to proceed with the Complaint it has filed here.

19       Beyond the Complaint, the government has now moved to stay this proceeding indefinitely

20 based on *in camera*, *ex parte* evidence it refuses to allow me to see. Dkt. No. 26. As explained

21 above, I am fully familiar with the evidence regarding the allegations of the Complaint. There is

22 no reasonable explanation for the government's attempt to stay other than to continue to interfere

23 with my civil rights and my business without any meaningful oversight, without having to prove

24 its case or even provide due process.

25       The appropriate sanction is dismissal with prejudice, together with an order enjoining

26 further criminal or civil action against me without leave of court, and at the absolute minimum

27 some amount of monetary sanction to compensate me for having to defend against this frivolous

28 forfeiture action.. "Rule 11 sanctions are designed to deter, not compensate." *Willis v. City of*

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1  *Oakland*, 231 F.R.D. 597, 600 (N.D. Cal. 2005). While being forced to pay for the costs of

2  fighting this frivolous complaint is part of an appropriate sanction, *see id.*, the government as

3  plaintiff will not be deterred by having to pay a few thousand, or even a few hundred thousand

4  dollars. Dismissal with prejudice would protect this property, but it would still allow the

5  government to bring other frivolous civil or criminal charges, or apply for frivolous search and

6  seizure warrants, in retaliation. The Court should therefore fashion an additional sanction,

7  admittedly fairly unique to this case, of exercising oversight over any further civil or criminal

8  investigation into me or AML Bitcoin to enforce the Fourth and Fifth Amendment guarantees that

9  no warrants shall issue against me but upon probable cause, and that I shall not be deprived of life,

10  liberty, or property, without due process of law.

11  **CONCLUSION**

12      The government has no factual or legal basis to file its Complaint. It knows, or should have

13  known, that the AML Bitcoin is a legitimate business based on patented technology. The

14  government knows that "VICTIM ONE," Benjamin Boyer, was actually only a victim of "JD,"

15  Dillman's breach of the contract between them in December 2018, and not a victim of anything

16  done by me or my company. The government should be sanctioned for filing its baseless and

17  retaliatory complaint, and the most appropriate sanction would require the government to seek

18  leave of court before taking any further civil or criminal action against me or my company. I

19  therefore respectfully request that the Court grant my motion for sanctions under Fed. R. Civ. P.

20  11, and enter an appropriate order dismissing the complaint with prejudice, awarding me

21  appropriate monetary sanctions, and enjoining the government from filing other search or seizure

22  warrants, civil complaints, or criminal charges without leave of court.

23  Dated:  June 13, 2020                    Respectfully submitted,

24

25

26                              By:  *R. Marcus Andrade*

27                              Rowland Marcus Andrade
                                In Pro Se and Claimant

28

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

DOJ REFORM