MANUEL A. MEDRANO (SBN 102802)
  *mmedrano@zuberlawler.com*
**ZUBER LAWLER & DEL DUCA LLP**
350 S. Grand Ave., 32nd Floor
Los Angeles, California 90071
Telephone: (213) 596-5620
Facsimile: (213) 596-5621

BRIAN J. BECK (*pro hac vice*, IL BN 6310979)
  *bbeck@zuberlawler.com*
**ZUBER LAWLER & DEL DUCA LLP**
135 S. LaSalle St., Suite 4250
Chicago, Illinois 60603
Telephone: (312) 346-1100
Facsimile: (213) 596-5621

*Attorneys for Claimant
Rowland Marcus Andrade*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>        v.<br><br>ONE PARCEL OF REAL PROPERTY LOCATED AT 9414 PLAZA POINT DRIVE, MISSOURI CITY, TEXAS 77459,<br><br>               Defendant.<br><br>ROWLAND MARCUS ANDRADE,<br><br>               Claimant.<br><br>SOLMAZ ANDRADE,<br><br>               Claimant.<br><br>WILMINGTON SAVINGS FUND SOCIETY, FSB as trustee for IRP FUND II TRUST 2A,<br><br>               Claimant. | Case No. 3:20-cv-2013-RS<br><br>**NOTICE OF MOTION AND MOTION OF ROWLAND MARCUS ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 11(C); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>*Filed concurrently with DECLARATION OF ROWLAND MARCUS ANDRADE; DECLARATION OF BRIAN J. BECK; AND [PROPOSED] ORDER*<br><br>Judge:   Hon. Richard Seeborg<br><br>Trial Date:   None Set<br><br>Hearing Date: August 13, 2020, 1:30 p.m. |

3161-1002 / 1642834.1

**TO UNITED STATES OF AMERICA AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on August 13, at 1:30 p.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Richard Seeborg, located in the United States Courthouse, San Francisco Courthouse, Courtroom 3, Rowland Marcus Andrade, by and through his attorneys, will and hereby does move this Court for SANCTIONS AND DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 11(C).

Andrade respectfully requests that the Court sanction the United States for its violation of Fed. R. Civ. P. 11 by: (1) dismissing the Complaint with prejudice, and (2) awarding such monetary sanctions equal to all legal fees as a result of this 2 year investigation, or as the Court deems appropriate. This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Declarations of Rowland Marcus Andrade and Brian J. Beck filed concurrently herewith, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 3

STATEMENT OF ISSUES PRESENTED ........................................................................ 5

STATEMENT OF FACTS .................................................................................................. 5

    A.    The Invention and Development of AML Bitcoin ............................................ 5

    B.    The Japheth Dillman/VICTIM ONE AML Bitcoin Token Transactions ........................... 8

    C.    Jack Abramoff and His Associates' Extortionate Scheme ............................... 11

    D.    Procedural History of this Case. .................................................................... 13

ARGUMENT ...................................................................................................................... 14

    A.    There is no evidentiary basis for the government's claims that the allegedly fraudulent statements in the Complaint are false ........................................................ 15

        1.    The alleged statements regarding development of AML Bitcoin were true. ............... 16

        2.    The allegedly fraudulent statements regarding the use of VICTIM ONE's funds are disproven by the contracts governing his AML Bitcoin Token purchases. ............................ 18

        3.    The allegedly fraudulent statements made regarding business arrangements with governments and ports were true to my knowledge, not fraudulent. ...................................... 19

    B.    There is no evidentiary basis specifically for any scheme to defraud VICTIM ONE based on undisputed evidence that has been known to the government. ............................... 20

C.      There is no evidentiary basis for the Complaint's allegations that the Defendant Property was purchased with proceeds from fraud, or as part of a money laundering scheme. ................ 21

D.      The government should be sanctioned, and the appropriate sanction is dismissal with prejudice, enjoining the government from filing additional actions against Andrade without leave of court, and an appropriate monetary award. ................. 23

CONCLUSION ........................................................................... 25

## TABLE OF AUTHORITIES

**Cases**
*Christian v. Mattel, Inc.*, 286 F.3d 1118 (9th Cir. 2002) ........................ 14
*Road & Highway Builders v. N. Nev. Rebar*, 284 P.3d 377 (Nev. 2012) ..................... 18
*United States v. Brugnara*, 856 F.3d 1198 (9th Cir. 2017) .......................... 16
*United States v. Jinian*, 725 F.3d 954 (9th Cir. 2013)............................ 16
*United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020)............................ 20
*Willis v. City of Oakland*, 231 F.R.D. 597 (N.D. Cal. 2005) ........................ 24

**Statutes**
18 U.S.C. § 1343 ...................................................... 15
18 U.S.C. § 981 ...................................................... 3

**Rules**
Fed. R. Civ. P. 11 .................................................. 5, 14
Fed. R. Civ. P. 11(c)(2) .............................................. 5

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The United States has instituted this civil forfeiture action, seeking to confiscate Claimant Andrade's residence in Texas, based on factual allegations that lack evidentiary support and that cannot support a claim for civil forfeiture under 18 U.S.C. § 981. Specifically, the government alleges that Andrade and his property are involved in wire fraud and/or money laundering committed primarily by an individual identified as J.D., in connection with his solicitation of an individual identified as VICTIM ONE to invest in the cryptocurrency business Andrade created and invented called AML Bitcoin. But the government's Complaint lacks evidentiary support and a legal basis in three critical ways: (1) the government cannot provide evidence that any of the statements it alleges in the Complaint to be fraudulent are fraudulent, because they are in fact true; (2) the government cannot demonstrate any specific intent to defraud, because Andrade was not aware of VICTIM ONE when he made the purchases the government alleges to have been induced by fraud; and (3) the government cannot trace the proceeds of any alleged fraud to the defendant property.

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1    AML Bitcoin, the cryptocurrency at the heart of the government's Complaint, is a

2  legitimate, honest cryptocurrency built on technology Andrade invented and for which Andrade

3  obtained a portfolio of patents, duly examined and issued by the United States Patent Office.

4  Arguably, the United States government should be thanking him for inventing it rather than

5  attempting to punish him through civil forfeiture. The technology contains innovative biometric

6  capabilities helpful to prevent the types of theft and illicit use of cryptocurrency to which other

7  digital currencies are susceptible. After a reasonable development period during which Andrade's

8  company, NAC Foundation, LLC ("NAC"), sold millions of AML Bitcoin Tokens, NAC released

9  the full-featured AML Bitcoin product with its unique security features. That release occurred in

10  April 2020, and users are now able to trade in the full-featured AML Bitcoin. Each of the

11  government's factual allegations of fraud are based on the false premise that AML Bitcoin does

12  not have technology. As the exhibits attached to this motion demonstrate, AML Bitcoin is not a

13  scam and is a legitimate technology.

14    In fact, the events alleged in the Complaint were part of a scheme by disgraced lobbyist

15  and convicted felon Jack Abramoff to extort Andrade into selling his business interests and

16  intellectual property. The "J.D." identified in the Complaint is Japheth Dillman, an associate of

17  Abramoff's whom Andrade hired as a "Chief Strategy Officer" at Abramoff's request. After

18  initially gaining his trust by offering to help Andrade's company develop business partnerships

19  with influential United States and foreign politicians, Abramoff attempted to force Andrade to sell

20  his business to a group of his associates for $100 million, as part of which Abramoff would

21  receive a $40 million "finder's fee," starting in October 2018. Three days after Andrade

22  conclusively turned down Abramoff's offer on August 12, 2019, the IRS began its audit of his

23  business. In the next few weeks, Abramoff's business associate David Cohen sent multiple

24  threatening letters indicating that if Andrade did not agree to the deal, the government would

25  commence civil forfeiture proceedings against him and his business in order to destroy that

26  business, which is exactly what has happened by virtue of the government filing its civil forfeiture

27  Complaint. In view of Abramoff's threats and as explained in more detail below, the actions

28

3161-1002 / 1642834.1

Case No. 3:20-cv-2013-RS

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1  alleged in the Complaint were performed by Dillman to create an artificial and frivolous civil

2  forfeiture claim against Andrade.

3       Andrade served the present motion on the government on June 13, 2020, allowing the

4  government the full 21 days permitted by Fed. R. Civ. P. 11(c)(2) to either withdraw the

5  Complaint or to explain its evidentiary basis for the Complaint. The government did neither.

6  Andrade therefore is filing this motion for sanctions asking the Court to order that the Complaint

7  be dismissed with prejudice as a sanction for the government's failure to produce evidence

8  supporting its Complaint and to conduct a reasonable investigation before filing its Complaint, and

9  that the Court enjoin the government from filing additional civil or criminal complaints or

10  indictments against Andrade, his business, or his property without leave of court.

11                          **STATEMENT OF ISSUES PRESENTED**

12  1.       Did the Plaintiff United States conduct a reasonable inquiry under the circumstances and

13  have evidentiary support for its factual contentions before filing the Complaint in this civil

14  forfeiture action?

15  2.       What is the appropriate sanction under Fed. R. Civ. P. 11 for the government's

16  misconduct?

17                              **STATEMENT OF FACTS**

18  A.       **The Invention and Development of AML Bitcoin**

19       Cryptocurrency has developed into a major industry since its invention in 2008 and

20  subsequent creation of Bitcoin. Cryptocurrencies are, as the Ninth Circuit has described them, "a

21  form of digital currency based on mathematical algorithms that is not controlled by any country,

22  bank, or individual." *United States v. Costanzo*, 956 F.3d 1088, 1088 (9th Cir. 2020). Because

23  Bitcoin operates through a distributed system outside the control of governments or banks, and by

24  its design is pseudonymous, many of the early uses of Bitcoin were for illicit transactions. *See*

25  Declaration of Rowland Marcus Andrade in Support of his Motion for Sanctions ("Andrade

26  Decl."), Ex. 4 at 15. Cryptocurrencies also became attractive targets for hackers and thieves, as

27  hundreds of millions of dollars of Bitcoins were stolen from 2014-2016. *Id.* at 15-16.

28

1    In response to the market's need for a more secure cryptocurrency, Andrade developed

2   methods for securing cryptocurrency with biometric data. Andrade began developing

3   cryptocurrency with anti-money-laundering (AML) security features in 2012, and formed NAC

4   Foundation, LLC in 2014. Andrade Decl. at ¶ 2. Using some of his proprietary technology,

5   Andrade developed the Aten Coin, a digital currency designed to be compliant with anti-money-

6   laundering and anti-terrorist regulations and to be theft-resistant. Andrade Decl. at ¶ 4, Ex. 4 at 2.

7   NAC officially launched Aten Coin publicly on September 21, 2015, selling about nine million

8   Aten Coins. *Id.* Andrade's first compliant digital currency patent was filed in March 3, 2015 in

9   Europe which gives a deep understanding of the technology. Andrade Decl. at ¶ 5. The

10   government has in its possession the original source code for the AtenCoin.

11    Andrade then sought to improve on the Aten Coin with AML Bitcoin, a cryptocurrency

12   with updated protocols still possessing some of the unique biometric security features he invented.

13   Andrade has obtained seven United States patents on the methods he invented, U.S. Patents Nos.

14   9,985,964, 10,116,657, 10,182,051, 10,298,571, 10,298,572, 10,389,713, and 10,484,178, with

15   other applications still pending, as well as many related patents in other countries, dating back to

16   an earliest filing date in March 2016. Andrade Decl. at ¶ 5. These patents are licensed to NAC for

17   use in the AML Bitcoin system. *Id.* NAC Foundation, LLC also had contracts with several ID

18   Verification companies, such as Jumio Corp. Andrade Decl., Ex. 1. NAC also has and had

19   multiple contracts to provide transaction monitoring for suspicious activity using Andrade's

20   technology with, among others, GlobalVision Systems, Inc. and ComplyAdvantage. Andrade

21   Decl., Exs. 2 and 3. NAC also started building its own internal transaction monitoring system

22   called DetectM, and finalized its own ID verification system called the VIN system, which is

23   operational now as part of AML Bitcoin. Andrade Decl. at ¶ 9.

24    While AML Bitcoin was in development, Andrade held an initial coin offering ("ICO") of

25   AML Bitcoin Tokens in October 2017. Andrade Decl. at ¶¶ 10, 12. AML Bitcoin Tokens did not

26   have the intended security features that the AtenCoin had, and that the AML Bitcoin currently has

27   in place. The AML Bitcoin Tokens existed as a placeholder to allow users to begin using NAC's

28   products while AML Bitcoin was in development. Andrade Decl. at ¶ 11, Ex. 5. During the ICO,

Case No. 3:20-cv-2013-RS

3161-1002 / 1642834.1

1  NAC issued millions of AML Bitcoin Tokens between October 2017 and February 2018, at prices

2  of $1.00 to $1.50 per AML Bitcoin Token. Andrade Decl. at ¶ 12.

3       During the development cycle, Andrade worked tirelessly to get the AML Bitcoin Token

4  listed on public exchanges to allow users to buy and sell openly. He received assurances from

5  public cryptocurrency exchange HitBTC in November of 2017 that AML Bitcoin Tokens would

6  be listed on their exchange in a few months, but that listing got delayed due to concerns about

7  general United States cryptocurrency regulations outside his control. Andrade Decl. at ¶ 13.

8  Andrade paid the listing fees to HitBTC in October 2017. Andrade Decl., Ex. 6. On September 13,

9  2018, HitBTC began listing the AML Bitcoin Token.

10       Andrade continued developing AML Bitcoin technology throughout 2018 and 2019,

11  making steady progress. Andrade Decl. at ¶ 15. To the extent the launch of AML Bitcoin was

12  delayed, much of that delay was caused by the government's improper investigation into AML

13  Bitcoin. The government (through FBI Agent Rohan Wynar) was aware in 2018, through a

14  recorded call with Richard Naimer, of the ID Verification System that NAC was funding. Andrade

15  Decl. at ¶ 16. The government then started harassing AML Bitcoin supporters and financial

16  backers. Andrade Decl. at ¶ 17. Federal agents intimidated AML Bitcoin customers to find

17  someone who would support their false narrative that Andrade was somehow involved in fraud.

18  Andrade Decl. at ¶ 17. These agents' harassment caused people to quit the project while forcing

19  NAC to spend money on legal fees.

20       Although the actions of the agents delayed the AML Bitcoin project, the public beta testing

21  of the AML Bitcoin technology commenced in November 2019. Andrade Decl. at ¶ 19.

22  Information regarding how to operate the AML Bitcoin during the beta test was publicly available

23  through NAC's public YouTube channel, posted on November 26, 2019, at

24  https://www.youtube.com/watch?v=ztwyqpmlSzU. One of the videos uploaded on November 26,

25  2019, titled "How to Verify Your Identity with the Virtual Identity Network (VIN) System

26  Through AMLWallet.com," discusses how to use the identity verification system unique to AML

27  Bitcoin. A list of videos is available at www.amlbitcoinvideos.com. Andrade Decl. at ¶ 19. On

28

1   April 12, 2020, AML Bitcoin launched, and AML Bitcoin Token holders were able to exchange

2   their tokens for AML Bitcoins on a 1:1 exchange basis. Andrade Decl. at ¶ 21.

3   **B.      The Japeth Dillman/VICTIM ONE AML Bitcoin Token Transactions**

4           Andrade had a brief business relationship in 2017 with an individual named Japheth

5   Dillman, whom he believes to be the "J.D." identified in the Complaint.  Andrade Decl. at ¶ 22. In

6   2017, famous lobbyist and convicted felon Jack Abramoff came to Andrade offering to help

7   develop AML Bitcoin partnerships with government officials. Andrade Decl. at ¶ 22. As part of

8   his assistance, Abramoff encouraged Andrade to hire Dillman, one of Abramoff's associates, as a

9   "Chief Strategy Officer." Andrade Decl. at ¶ 23. NAC proceeded to hire Dillman as its Chief

10  Strategy Officer in a letter dated September 24, 2017. Andrade Decl., Ex. 10. Dillman's duties

11  were not to sell AML Bitcoin Tokens, but to generate publicity and marketing strategies including

12  a developing partnership with the Port of San Francisco, foreign governments, and Silicon Valley

13  tech companies. *Id.* at Addendum A. He never performed those duties, and Andrade later

14  terminated his involvement with the project in December 2018. Andrade Decl. at ¶ 24.

15          In January 2018, a company named Block Bits Capital, LLC ("Block Bits") owned by J.D.,

16  Jack Abramoff, and their associates, purchased AML Bitcoin Tokens directly from NAC as part of

17  the initial sale (the ICO) of AML Bitcoin Tokens. Distribution statements show purchases of AML

18  Bitcoin Tokens for Block Bits Capital LLC. *Compare* Andrade Decl., Ex. 11 to Complaint at ¶ 10.

19  Andrade never knew that "VICTIM ONE"—an individual he now knows to be Benjamin Boyer—

20  was the source of the funds. Andrade Decl. at ¶ 26. Dillman's own email to Andrade regarding the

21  purchase states that Block Bits is the purchaser and never mentions Boyer/VICTIM ONE.

22  Andrade Decl., Ex. 12. Andrade only learned of Boyer's involvement in October of 2018 when

23  Block Bits contacted him and brokered the purchase of AML Bitcoin Tokens through a purchase

24  agreement where Boyer/VICTIM ONE and Andrade never spoke. Distribution Statements for

25  Block Bits indicate that the transactions referred to in the Complaint were payments from Boyer to

26  Block Bits, not to NAC. Andrade Decl., Ex. 16. The corresponding transactions strongly indicate

27  that the individual identified in the Complaint as "VICTIM ONE" is Benjamin Boyer.

28

1   In order to make each purchase of AML BitCoin Tokens directly from Andrade in October

2   2018, Boyer had to read and agree to the terms and conditions listed on AML BitCoin's website

3   (Dkt. No. 18, Ex. J), and sign a purchase agreement setting out the terms of the sale (Andrade

4   Decl., Ex. 17). Andrade never made any representations to Boyer about what he was buying

5   because he never spoke to Boyer. Andrade Decl. at ¶ 32.

6   On June 9, 2019, Boyer revealed to Andrade that he had an agreement between himself

7   and Dillman. Boyer and Dillman created Block Bits AML Holdings, a Delaware Limited Liability

8   Company, by an agreement effective January 11, 2018. Andrade Decl., Ex. 21. Though the copy

9   of the Block Bits AML Holding Company Agreement in Andrade's possession does not identify

10  the members, it does state that Dillman is the "partnership representative" authorized to represent

11  Block Bits. Andrade Decl., Ex. 21 at Section 9.9. Meanwhile, Abramoff and his associates set up a

12  related company, Block Bits Fund I, L.P., that was funded in large part by Abramoff, his

13  associates, and his shell company Landfair Capital Consulting, Inc. Dkt. No. 31, Ex. G.

14  Dillman informed Andrade on January 14, 2018, that Block Bits Capital, LLC (a separate

15  company from Block Bits AML Holdings, of which Boyer was a member) intended to put in an

16  order for $50 million of AML BitCoin, and was sending an initial wire of $850,000 as part of that

17  purchase. Andrade Decl., Ex. 12. After purchasing over $1.4 million in AML Bitcoin Tokens

18  through Block Bits Capital as purchaser, as part of the ICO in January 2018, Dillman informed

19  Andrade that Block Bits Capital was unable to raise and invest the remainder of the intended $50

20  million. Andrade Decl., Ex. 14. In Dillman's letter notifying Andrade of the inability to complete

21  the $50 million purchase, Dillman does not mention Boyer at all. *Id.*

22  Boyer later told Andrade in mid-2019 that a few months earlier, in late 2018, the

23  government told Boyer that AML Bitcoin was a scam. Andrade Decl., Ex. 22. Instead of

24  contacting Andrade directly about the government's allegations, Boyer contacted Dillman and

25  fellow Block Bits AML Holdings member David Mata. Andrade Decl. at ¶ 38. Dillman then

26  entered into an agreement with Boyer to buy him out without Andrade's knowledge. Andrade

27  Decl. at ¶ 39. According to Boyer and Dillman's agreement, the buyout was supposed to happen

28  on January 9, 2019. Andrade Decl. at ¶ 39.

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1    Dillman and Boyer then had an apparent falling out. Dillman had agreed to purchase the

2   AML Bitcoin Tokens in Block Bits AML Holding's possession (which included more than just the

3   January 2018 purchases) for about $3 million. Andrade Decl. at ¶ 40. As discussed previously, the

4   purchases of the tokens from NAC's position were from Block Bits Capital and not from Block

5   Bits AML Holdings, their equity fund. Andrade Decl. at ¶ 40. Andrade knew nothing about the

6   equity fund or who was involved with it. Andrade Decl. at ¶ 43. However, Dillman failed to pay

7   Boyer any of the promised money for the tokens. Andrade Decl. at ¶ 40. Boyer accordingly filed a

8   lawsuit against Dillman for breach of contract in the Superior Court of California for the County

9   of San Francisco on April 10, 2019, Case No. CGC-19-575158. Andrade Decl., Ex. 23. Dillman

10   never responded to that complaint, and Boyer obtained a default judgment against Dillman for

11   $3,103,674.63 on June 19, 2019.  Andrade Decl., Ex. 24.

12    Around late November 2018, Andrade found out that Dillman and his partner David Mata

13   were allegedly making false misrepresentations to people when brokering the sale of AML Bitcoin

14   Tokens. Andrade Decl. at ¶ 33. When Andrade learned of this issue in late 2018, NAC's

15   compliance attorney Chris Ray reached out to Boyer, Dillman, and Mata. Andrade Decl. at ¶ 33.

16   Ray sent Boyer an email asking him to contact Ray. Andrade Decl., Ex. 18. Andrade's staff

17   followed up on that email to inform Boyer that Ray's job was to ensure that all the information he

18   received from his client representative was true and accurate. Andrade Decl., Ex. 18. Shortly

19   thereafter, David Mata, now representing himself as the Managing Director of Block Bits Capital,

20   informed Andrade that Boyer had already sold his AML Bitcoin Tokens to Dillman, and so would

21   likely not respond to Andrade or Ray. *Id*.; *see also* Andrade Decl., Ex. 19. As a result of the

22   information Andrade learned indicating that Mata and Dillman may have made false

23   representations to Boyer, Andrade reached out to Boyer to offer him a full refund of his direct

24   purchases in December 2018 and in January 2019. Andrade Decl., Ex. 20. Andrade also informed

25   Mata and Dillman that he would no longer do any business with Block Bits. Andrade Decl., Ex.

26   20. Neither Mata, Dillman, nor Boyer responded to that email for months. Andrade Decl. at ¶ 35.

27    In May 2019, after Boyer filed his lawsuit against Dillman but before he obtained his

28   default judgment, Boyer responded to Andrade to say that Dillman had instructed him in

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1   November/December of 2018 not to talk to Andrade or anyone from NAC. Andrade Decl., Ex. 25.

2   Boyer asked in the email what J.D.'s role was with AML Bitcoin and what the state of AML

3   Bitcoin's development was. *Id.* Andrade explained that he had previously tried to reach out to

4   Boyer, and would be willing to arrange a call with him through legal counsel to discuss these

5   issues. *Id.*; *see also* Andrade Decl., Ex. 25. Boyer only reached out to Andrade after Dillman

6   violated their agreement by failing to pay Boyer as Dillman had promised. Andrade was not a part

7   of and had no knowledge of what was going on between Boyer, Dillman, and Mata.

8   **C.      Jack Abramoff and His Associates' Extortionate Scheme**

9        In 2018, Andrade started to get concerned about Jack Abramoff's and Dillman's false

10  promises. Dillman contacted Andrade again in around March or April of 2018 and told him that

11  Dillman could get the $50 million dollar AML Bitcoin Token purchase deal back but he needed to

12  be compensated for his time. Andrade Decl. at ¶ 44. Specifically, Dillman asked Andrade to pay

13  him a percentage of what Block Bits Capital, LLC purchased in AML Bitcoin Tokens. Andrade

14  Decl. at ¶ 44. After Andrade refused to agree to that deal or pay Dillman's demanded percentage,

15  Dillman continuously sent invoices to Andrade and his CPA. Andrade Decl. at ¶ 45. The invoices

16  were from a different company name Andrade had never saw before, called Janga. Andrade Decl.

17  at ¶ 45. Andrade still refused to make Dillman's demanded payments. Andrade Decl. at ¶ 45.

18       Jack Abramoff then contacted Andrade and told him that Dillman was going to set up a

19  meeting between Andrade and the Port of San Francisco commissioner Leslie Katz, and

20  California's Lieutenant Governor Gavin Newsom. Andrade Decl. at ¶ 46. The meeting with Lt.

21  Governor Newsom occurred on April 26, 2018. Andrade Decl., Ex. 26. Abramoff and Dillman

22  informed Andrade that a deal was in progress with the Port of San Francisco. Andrade Decl. at ¶

23  47. Abramoff insisted that unless Andrade paid Dillman the money he requested, that nothing

24  would be done with the governor and nothing with the Port. Andrade Decl. at ¶ 47. Andrade was

25  informed the State of California wanted to utilize his technology so they could start taxing

26  marijuana, and needed the AML Bitcoin technology because the federal government could crack

27  down on FDC supported banks. Andrade Decl. at ¶ 48. The meeting with the Port of San

28  Francisco took place on Friday April 27, 2018. Andrade Decl., Ex. 27. Then, on April 28, 2018,

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1   Andrade had another conversation with Abramoff, in which he persuaded Andrade to pay Dillman

2   or Andrade would lose the deal with the Port of San Francisco, various other ports in California,

3   and with the State of California. Andrade Decl. at ¶ 50. Andrade paid Dillman 450 ethereum (at an

4   approximate total market value of around $300,000), knowing he had just put Andrade in front of

5   the soon to be elected Governor. Andrade Decl. at ¶ 50.

6       Around December of 2018, Andrade's relationship with Jack Abramoff began to

7   deteriorate. By that point, Andrade had been in discussions with Abramoff for almost 2 years in

8   which Abramoff made many promises concerning contacts he could make for NAC, but he never

9   delivered results. Andrade Decl. at ¶ 52. Things got worse when Andrade loaned Richard Naimer,

10  a close associate of Jack Abramoff, over $700,000 in the fall of 2018 in exchange for shares in

11  Naimer's company, DIT Network. Andrade Decl. at ¶ 52. Naimer refused to pay Andrade back or

12  give him his shares in the company. Andrade Decl. at ¶ 52. Naimer also hired an attorney to draft

13  a formal loan agreement between his entity, DIT, and NAC, memorializing the terms of the loan.

14  Andrade Decl., Ex. 28. When it became evident that Naimer wouldn't be making his payments,

15  Andrade broke off business relations with him. Andrade Decl., Ex. 29.

16      After that, Abramoff and Naimer demanded that Andrade sign over the rights to his

17  technology in order for him to receive the shares in DIT Network he was already entitled to. In

18  January 2019, Andrade was woken up around 5.a.m with a call from Naimer, and Naimer told him

19  that the agreement had to be signed and sent back at that very moment. Andrade Decl. at ¶ 54, Ex.

20  30. Throughout the rest of 2019, Jack Abramoff continued in his efforts to extort Andrade of his

21  technology by causing Abramoff's contacts to threaten Andrade in order to convince him to agree

22  to give Abramoff a 40% brokerage fee for selling Andrade's technology to an undisclosed buyer,

23  which more than likely was J.D. and his partner David Mata.

24      These demands culminated in threats that if Andrade did not agree to Abramoff's deal,

25  civil forfeiture actions would be brought against him and his company. As explained previously in

26  Andrade's Motion to Preserve Evidence (Dkt. No. 31), shortly after Andrade refused Abramoff's

27  offer, Abramoff's associate David Cohen sent an email on August 20, 2018, threatening that if

28  Andrade passed on the deal, "you can imagine on your own the possible bad outcomes several of

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1  which I have listed at the bottom of this email in blue." Dkt. No. 31 at 4. The bad outcomes listed

2  included civil forfeiture actions brought against Andrade and his company. *Id.* In case that threat

3  were not clear enough, Cohen sent another email eight days later threatening more explicitly that if

4  Andrade did not accept the deal, the government would begin an asset forfeiture proceeding

5  against him, and the business would be dead. *Id.*

6  **D.      Procedural History of this Case.**

7           The government filed its Complaint in this case on March 23, 2020. Dkt. No. 1. Andrade

8  mailed his verified claim for the defendant property to the Clerk of this Court on May 4, 2020.

9  Dkt. No. 10. He filed his Answer to the Complaint on May 18, 2020. Dkt. No. 18.

10          Andrade sought accelerated discovery to determine the basis for the government's claim.

11  To that end, he filed a motion to shorten time and to immediately ender a case management order

12  on May 26, 2020. Dkt. No. 22. The government claimed in its opposition that it expected to be

13  able to access relevant discovery by mid-June. Dkt. No. 24 at 2. But the very next day, the

14  government moved to stay the pending case based on *ex parte* evidence submitted *in camera*, a

15  motion that would delay discovery indefinitely if granted. Dkt. Nos. 25-26.

16          On June 4, 2020, the Court allowed Andrade time to oppose the motion to stay, and

17  cautioned the government that if the Court determines "that the government is reflexively and

18  unreasonably withholding documents from Andrade," it would consider sanctioning the

19  government attorneys and agents involved. Dkt. No. 30. Shortly thereafter, based on evidence that

20  a computer seized from Andrade in 2018 had been tampered with by the government while it was

21  in government custody, Andrade moved for a protective order requiring the government to

22  preserve evidence. Dkt. No. 31.

23          With the government resisting all attempts by Andrade to discover the evidence supporting

24  its claims, Andrade served the present motion on the government's attorney on June 13, 2020.

25  Declaration of Brian J. Beck in Support of Claimant's Motion for Sanctions and Dismissal ("Beck

26  Decl"), Ex. A. Since then, the government initiated criminal cases against both Andrade and

27  Abramoff in this Court, Case Nos. 3:20-cr-249 and 3:20-cr-260 respectively, unsealing those cases

28

1   on June 25, 2020. Attorneys for Andrade entered notices of appearance in this case on June 26,

2   2020. Dkt. Nos. 37-38.

3       In a last attempt to resolve this matter before filing the present motion, Andrade's attorneys

4   reached out to opposing counsel on July 1, 2020, stating that they intended to file this motion

5   unless the government either withdrew the complaint or produced the requested evidence. Beck

6   Decl., Ex. B. Counsel for the United States responded saying that the government would not

7   withdraw a complaint that was already found to have probable cause for an indictment, and still

8   would not produce or identify the evidence supporting this Complaint. Beck Decl., Ex. B. Counsel

9   for Andrade revised this motion to address the above events and make grammatical corrections,

10  but has not modified the substance of the motion in any way. Beck Decl. at ¶ 6. The 21-day safe-

11  harbor period of Fed. R. Civ. P. 11(c)(2) expired on July 6, 2020, and so Andrade now files the

12  present motion with the Court.

13                              **ARGUMENT**

14      Federal Rule of Civil Procedure 11 requires that a person, by presenting to the court a

15  complaint or other pleading and signing that pleading, certify that "to the best of the person's

16  knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . .

17  . the allegations and other factual contentions have evidentiary support or, if specifically so

18  identified, are likely to have evidentiary support after a reasonable opportunity for further

19  investigation or discovery." When a complaint is the focus of Rule 11 proceedings, the Court must

20  conduct a two-prong inquiry to determine (1) whether the complaint is objectively 'baseless,', and

21  (2) if the attorney has conducted 'a reasonable and competent inquiry' before signing and filing

22  it." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002).

23      Here, the evidence presented below demonstrates that the government did not have

24  evidentiary support for the key factual allegations in the Complaint, and could not have conducted

25  a "reasonable and competent inquiry" before filing the Complaint. Had the government conducted

26  a reasonable and competent inquiry of Andrade, AML Bitcoin, and the NAC Foundation, it could

27  not have believed that the allegedly fraudulent statements made that "the cryptocurrency was

28  under development; that millions of tokens representing the cryptocurrency had been successfully

14

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1  sold; and that [VICTIM ONE's] funds would be used to further the development of the

2  cryptocurrency" were false; that AML Bitcoin's development was "minimal and not progressing;"

3  that "[t]o date, Andrade and the NAC have not made any meaningful progress towards developing

4  AtenCoin, AML Bitcoin, or ABTC," or that any other statement alleged to be fraudulent by the

5  Complaint was in fact fraudulent. Dkt. No. 1 at ¶¶ 9, 11, 16.

6  **A.**     <u>**There is no evidentiary basis for the government's claims that the allegedly**</u>
              <u>**fraudulent statements in the Complaint are false**</u>

7

8         The Complaint primarily alleges that Andrade and/or his associates, primarily "J.D."

9  (presumably Dillman), induced "VICTIM ONE" (presumably Boyer) to invest in his

10  cryptocurrency project through fraudulent statements, and thus that Andrade committed, or at least

11  benefitted from, wire fraud under 18 U.S.C. § 1343. The Complaint alleges that either Andrade or

12  J.D. made the following supposedly fraudulent statements:

13  •     Undefined "materially false and misleading statements regarding the status of the
      development of the cryptocurrency and the use of funds raised from investors." Complaint,
      ¶ 9.

14

15  •     Undefined "false statements regarding business arrangements that Andrade and his
      associates had purportedly made with government agencies and ports, falsely leading
      investors to believe Andrade and his associates' statements about the prospects of the

16        AML Bitcoin cryptocurrency." Complaint, ¶ 9.

17  •     Statements made by J.D. in or around January 2018 that "the cryptocurrency was under
      development." Complaint, ¶ 11.

18

19  •     Statements made by J.D. in or around January 2018 that "millions of tokens representing
      the cryptocurrency had been successfully sold." Complaint ,¶ 11.

20  •     Statements made by J.D. in or around January 2018 that VICTIM ONE's "funds would be
      used to further the development of the cryptocurrency." Complaint, ¶ 11.

21

22  •     Statements made by Andrade in or around January 2018 that "the launch of the
      cryptocurrency was months away, notwithstanding that at the time of the statements

23        development were [sic] minimal and not progressing." Complaint, ¶ 11.

24  The government also alleges, underlying its claims that the above statements are fraudulent, that

25  "To date, Andrade and the NAC have not made any meaningful progress towards developing

26  AtenCoin, AML Bitcoin, or ABTC." Complaint, ¶ 16.

27         The elements of wire fraud under 18 U.S.C. § 1343 are: "(1) the existence of a scheme to

28  defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to

3161-1002 / 1642834.1

1    defraud." *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013). A "scheme to defraud," under

2    the wire fraud statute, is a "scheme to deprive another of money or property by means of false or

3    fraudulent pretenses, representations, or promises." *United States v. Brugnara*, 856 F.3d 1198,

4    1207 (9th Cir. 2017). Thus, if the representations the government alleges that Andrade or J.D.

5    made in furtherance of the alleged "scheme to defraud" are in fact true, there can be no "scheme to

6    defraud," and thus no wire fraud.

7         1.    **The alleged statements regarding development of AML Bitcoin were true.**

8         AML Bitcoin was under development and making progress throughout 2018 and 2019,

9    resulting in its full-featured launch in April 2020. Andrade Decl. at ¶¶ 15, 21. The software

10   development for AML Bitcoin was not trivial, and over those two years our company made steady

11   progress. Andrade Decl. at ¶ 15. To the extent there were delays, much of them were caused by

12   the government investigation and interference in the business. Andrade Decl. at ¶¶ 15-17. AML

13   Bitcoin did suffer a lot of financial setbacks as a result of this two-year investigation, including

14   over $2 million dollars in expenses, fees, attorneys' fees and debts. Andrade Decl. at ¶ 17.  NAC

15   lost its software developer Hung Tran who had worked for NAC for two years because the

16   government investigation scared him into quitting in early 2019. Andrade Decl., ¶ 17, Ex. 9.

17        Still, NAC's public YouTube channel documents some of the improvements made over

18   that time. In June 2018, AML Bitcoin Tokens were listed on several public digital currency

19   exchanges, and a series of videos explains how to use each of those exchanges to trade AML

20   Bitcoin. Andrade Decl. at ¶ 18. In 2017 to 2019 , NAC was funding an ID Verification system that

21   was going to be integrated into AML Bitcoin. Andrade Decl. at ¶ 9. The government knew this

22   when they spoke to Richard Naimer in 2018 on a recorded call and he told them Andrade was

23   spending a few hundred thousand dollars each month in expenses towards developing biometric

24   identification software. Andrade Decl. at ¶ 16.

25        In November 2019, the AML Bitcoin technology was ready for public beta testing.

26   Andrade Decl. at ¶ 19. And in April 2020, AML Bitcoin was ready for public launch. Andrade

27   Decl. at ¶ 21. All this information, except for the April 12, 2020 launch date, was publicly

28

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1   available and documents pertaining to such **were** in the governments hands prior to them filing the

2   Compliant. The finalized AML Bitcoin is now listed on Lbank Exchange. Andrade Decl. at ¶ 21.

3      The government's allegations that no development was occurring or had occurred are thus

4   demonstrably false, as are the allegations that statements made regarding the development status

5   of AML Bitcoin were fraudulent. The Complaint alleges that Andrade and J.D. both made

6   fraudulent statements to VICTIM ONE that that AML Bitcoin was under development and near

7   launch, when development was minimal and not progressing at the time. Complaint at ¶¶ 11, 16.

8   As discussed above, the cryptocurrency was under development, and NAC had made meaningful

9   progress towards developing AML Bitcoin, resulting in public listings of AML Bitcoin Tokens

10   back in 2018 and the listing of the AML Bitcoin on June 12, 2020.

11      For that matter, the specific allegation of paragraph 16 of the Complaint that Andrade and

12   NAC have "not made any meaningful progress towards developing AtenCoin, AML Bitcoin, or

13   ABTC," is so clearly wrong that it demonstrates the government could not possibly have made a

14   reasonable inquiry into the allegation. NAC's White Paper for AML Bitcoin, dated October 4,

15   2017, and publicly available on NAC's website, explains that Aten Coin launched on September

16   21, 2015, and about 9 million Aten Coins were sold. Andrade Decl., Ex. 4 at 2.

17      One alleged false statement in the Complaint is that Andrade represented that "the launch

18   of the cryptocurrency was months away." Complaint at ¶ 11. At no point in January 2018 (the time

19   of Boyer's investment into Dillman's fund), did Andrade ever represent to anyone that the full-

20   featured AML Bitcoin launch would be months away. Andrade did, however, state that **he was**

21   "months" away from being able to begin testing of the AML Bitcoin. Andrade Decl. at ¶ 15. NAC

22   issued press releases in December 2017 that AML Bitcoin Token's listing on HitBTC, one of the

23   world's largest digital currency exchanges, was months away, based on communications with

24   HitBTC indicating that it would be listed in January 2018. Andrade Decl., Ex. 7. HitBTC backed

25   away from the listing at that time for reasons outside NAC's control, but did eventually list AML

26   Bitcoin Tokens in September 2018. Andrade Decl., Ex. 8. There was no fraudulent statement or

27   scheme to defraud, only normal adverse events, many of which are often beyond one's control and

28   that can affect any new business.

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1

2. <u>**The allegedly fraudulent statements regarding the use of VICTIM ONE's funds are disproven by the contracts governing his AML Bitcoin Token purchases.**</u>

2

3

In order to access NAC's website or purchase AML Bitcoin Tokens, or download the

4

AML Bitcoin Wallet to hold the digital currency, VICTIM ONE/Boyer had to read and agree to

5

the site's Terms and Conditions and sign a Purchase Agreement. Dkt. No. 18, Exs. J, N. The

6

Terms and Conditions explain clearly that AML Bitcoin and AML Bitcoin Tokens are unsecured

7

cyber currencies, not investments, securities, debt instrument, or any other form of asset that

8

would entitle VICTIM ONE to have a say in how his funds were used. Dkt. No. 18, Ex. J at ¶¶ 10-

9

18. The same Terms and Conditions require a user to agree that "[i]n making Your purchase of

10

AML BitCoins and/or AML BitCoin Tokens You are and have relied solely upon Your own

11

judgment, belief and knowledge as to the nature of the currency and the Cybercoin,

12

cryptocurrency, or digital market and industry and You are not relying on any statements made by

13

NAC, or any of its agents or representatives or on any of its advertising or marketing materials, or

14

any representation or statement made on any NAC Website." *Id.* at ¶ 41. The Purchase Agreement

15

that Boyer signed includes the same provisions. Andrade Decl., Ex. 17 at ¶¶ 3.j-3.r.

16

Boyer, therefore, could not possibly have been defrauded by being told orally (allegedly by

17

J.D.) that that his funds would be used to further AML Bitcoin's development as alleged by

18

Paragraph 11 of the Complaint. Under Nevada law, which governs the Purchase Agreements of

19

AML Bitcoin Tokens (*See* Andrade Decl., Ex. 17 at ¶ 13), claims for fraudulent inducement

20

cannot be based on an alleged fraud that conflicts with the contract's express terms, "as the terms

21

of the contract are the embodiment of all oral negotiations and stipulations." *Road & Highway*

22

*Builders v. N. Nev. Rebar*, 284 P.3d 377, 381 (Nev. 2012). The contracts Boyer signed to purchase

23

AML Bitcoin Tokens made clear that the Tokens were not an investment. As a matter of law, there

24

can be no fraud based on Dillman's alleged statement suggesting Boyer's purchase was an

25

investment, when Boyer signed contracts clearly stating that it was not.

26

Nevertheless, even if Boyer failed to read the contract before signing it, Andrade's actions

27

upon realizing what J.D. had done make it clear that there was no scheme to defraud. As stated in

28

the affidavit from Andrade's compliance attorney, he reached out to Boyer to determine if Dillman

18

1    had made statements suggesting that AML Bitcoin Tokens were an investment or security, and

2    offered to refund his tokens upon confirming if there had been a possible misunderstanding

3    between Boyer and Block Bits Capital. Andrade Decl. at ¶ 35. There can be no "scheme to

4    defraud" where Andrade offered to refund Boyer's money as soon as he learned there was even a

5    possibility that Dillman had allegedly defrauded Boyer. Furthermore, there can be no scheme to

6    defraud when Andrade tried to reach out to the purported victim Boyer, but was prevented from

7    communicating with him by Dillman and Mata.

8          3.    **The allegedly fraudulent statements made regarding business arrangements**

9               **with governments and ports were true to Andrade's knowledge, not fraudulent.**

10    In 2017 and 2018, NAC was involved in active discussions with governments and ports

11    regarding the use of NAC's secure blockchain technology. For example, on April 27, 2018,

12    Andrade, J.D., and Richard Naimer (the CEO of the digital identification company with which

13    NAC funded and worked on the biometric identification feature) met with Leslie Katz, Elaine

14    Forbes, and Byron Rhett, the Commissioner, Executive Director, and Chief Operating Office,

15    respectively, of the Port of San Francisco. Andrade Decl., Ex. 27. At that meeting, they discussed

16    potential implementation of blockchain based identification and tracking for passengers and cargo,

17    use of CrossVerify for the port's Transportation Worker Identification Credential, and adoption of

18    CrossVerify by cruise ship operators that could be integrated with immigration and security

19    authorities. *Id.* Katz had worked with Andrade, J.D., and now-infamous lobbyist Jack Abramoff

20    extensively to introduce NAC to United States and foreign government officials who might be

21    interested in using NAC's technology.

22    Therefore, the allegations of "false statements regarding business arrangements that

23    Andrade and his associates had purportedly made with government agencies and ports," without

24    more detail, lack any evidentiary basis. NAC had business arrangements with U.S. and foreign

25    government agencies and ports in January 2018. Absent any greater detail, the allegation that

26    general statements regarding business arrangements between NAC and government agencies and

27    ports were false lacks any evidentiary basis. Andrade never told anyone that the deals were

28

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1    finalized, only that NAC was working towards a contract until the government stepped in and

2    sabotaged it. Again, these allegations cannot support a scheme to defraud.

3    **B.      There is no evidentiary basis specifically for any scheme to defraud VICTIM ONE**
     **based on undisputed evidence that has been known to the government.**

4

5        "[T]he crime of wire fraud requires the specific intent to utilize deception to deprive the

6    victim of money or property, i.e., to cheat the victim." *United States v. Miller*, 953 F.3d 1095,

7    1099 (9th Cir. 2020). The only evidence in this case shows plainly that Andrade had no intent to

8    cheat VICTIM ONE/Boyer with respect to his purchase of AML Bitcoin Tokens.

9        Andrade never spoke directly to Boyer regarding his initial purchase of AML Bitcoin

10   Tokens. He never knew about the company Block Bits AML Holdings (the equity fund) which

11   both J.D. and Boyer were a part of until long after Block Bits AML Holdings made its purchases.

12   Andrade Decl. at ¶¶ 36, 43. Nor did he authorize Dillman to make any statement to induce Boyer

13   or anyone to purchase AML Bitcoin Tokens; Dillman's only role at NAC concerned general

14   business development, not sale of AML Bitcoin Tokens. Andrade Decl. at ¶ 23, Ex. 10.

15       As soon as Andrade learned that there was a possibility that some purchasers of AML

16   Bitcoin Tokens may have been misled by Dillman and his partner David Mata, he and his

17   compliance attorney Chris Ray immediately tried to contact Boyer. Andrade Decl., Ex. 13. Ray

18   personally called every purchaser of AML Bitcoin Tokens to ask a series of questions regarding

19   the nature of the Tokens, and ensured that each understood that the Tokens were a medium of

20   exchange, not the final product that would feature anti-money-laundering and know-your-

21   customer features, and were not tied to any physical, financial, or other asset and did not constitute

22   an investment or security. *Id.* at ¶ 5. Upon learning that Block Bits had misled one purchaser,

23   Daniel Aharanoff in October and November of 2018, NAC immediately offered to refund

24   Aharanoff's purchase and investigated further into other Block Bits brokered purchases. *Id.* at ¶ 7.

25   Aharanoff was provided with the correct information and decided against a refund. Ray then

26   attempted to reach out to Boyer repeatedly in November and December 2018, but Boyer never

27   answered his calls—and as it turned out, Dillman had instructed Boyer to not speak to Ray. *Id.* at ¶

28   9; Dkt. No. 18, Ex. O. Andrade informed Mata and Dillman that because Block Bits had

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1   apparently made false representations to Boyer, he was entitled to a full refund for his direct

2   purchases. Andrade Decl., Ex. 20. But Mata had informed Andrade that because he and Dillman

3   had bought out Boyer's Tokens, there was nothing to refund.

4          These communications refute any allegation by the government of a specific intent to

5   deceive. A person who intended to cheat VICTIM ONE/Boyer would have lied to him initially,

6   then refused to offer any refund or attempt to clarify any miscommunication. Andrade did the

7   exact opposite; he never lied to Boyer, and as soon as he found out his purchases may have been

8   induced by false statements from his apparent partners at Block Bits AML Holdings, he told

9   Dillman and Mata that Boyer may need to be refunded. It is not Andrade's fault that Boyer

10  ignored him and that, according to Dillman's own admissions, Dillman told Boyer to ignore

11  Andrade. It is Boyer's own fault, or at most Dillman's, that Boyer sold his tokens to Dillman and

12  totally ignored Andrade during that period.

13         If the government's theory is that Block Bits defrauded Boyer rather than NAC, the

14  government is also well aware that Andrade was not partners with Block Bits, Dillman, Mata, or

15  Abramoff. The government has copies of correspondence between these parties and Andrade

16  where they invited Andrade to join their organization, including buying into Block Bits Capital

17  because they believed in the longevity of his digital currency. Andrade Decl., Ex. 15. However,

18  the government is also aware that Andrade turned them down repeatedly, never joined their

19  company, and never created any type of joint venture. Andrade Decl. at ¶ 29.

20  **C.     There is no evidentiary basis for the Complaint's allegations that the Defendant**
        **Property was purchased with proceeds from fraud, or as part of a money laundering**
21      **scheme.**

22         None of the transfers of funds alleged in the Complaint were illegal. VICTIM ONE

23  deposited $1,105,000 from his personal and trust bank accounts into the Block Bits Capital

24  account in January 2018 and he had an agreement with a different company J.D. controlled called

25  Block Bits AML Holdings. Complaint at ¶ 10. Block Bits used that money to purchase AML

26  Bitcoin Tokens, and made that purchase by transferring the money to the "DSA account."

27  Complaint at ¶ 12. The "DSA account" is an account named "David Salmon & Associates, Inc.

28  Client Trust Account for NAC Foundation;" it is an attorney-client trust account that was used to

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1  hold money received from thousands of AML Bitcoin Token purchasers and it was held in his

2  escrow pending the tokens holders actually receiving what they paid for. This means David

3  Salmon would not release any of the funding that came in online until he received confirmation

4  from a CPA that the purchaser had received their tokens. During the ICO, there were thousands of

5  transactions. Andrade Decl., ¶ 27.  Once the purchases cleared, the money was transferred out of

6  escrow—a transfer that Andrade had no authority to approve, and the Complaint notably does not

7  allege that Andrade had any authority to approve—into NAC's payroll account only after the CPA

8  confirmed with the attorney that the people who purchased the digital currency indeed received

9  what they paid for. Andrade Decl. at ¶ 27, Ex. 13; Complaint at ¶ 12. From there, NAC paid

10 Andrade for his services as owner and CEO of NAC by transferring money—not VICTIM ONE's

11 money specifically—to the Fintech Fund Account and then to Andrade' personal account to pay

12 for the company's past debts to him.

13        The government cannot plausibly claim that its allegation of money laundering under 18

14 U.S.C. § 1956(a)(1)(B)(i) is warranted by existing law or a nonfrivolous extension of existing law,

15 or that the factual allegations supporting a claim for money laundering have any evidentiary basis.

16 To prove a claim for money laundering, the government must prove four elements: (1) that

17 Andrade knowingly conducted a financial transaction; (2) that he **must know** that the transaction

18 involved property which represented the proceeds of some form of **unlawful activity**; (3) the

19 transaction involved property which was in fact the proceeds of unlawful activity (here, wire

20 fraud); and (4) he engaged in the transaction with the intent to **conceal or disguise** the nature,

21 location, source, ownership, or control of property which was proceeds from the wire fraud. *See*

22 *United States v. Knapp*, 120 F.3d 928, 931 (9th Cir. 1997) (emphasis added). As discussed above,

23 the evidence available clearly shows that Andrade did not obtain VICTIM ONE/Boyer's payments

24 through wire fraud. But even if the money had been the proceeds of wire fraud, nothing in the

25 Complaint suggests that any of the transactions alleged in paragraphs 10-15 of the Complaint were

26 intended to conceal or disguise those proceeds. All the transactions went through ordinary

27 commercial banks, and followed the ordinary course of how money flows from sales receipts to

28 services provided to profits paid to an owner as in any business.

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1    The government also cannot plausibly claim that the defendant property is derived from

2    proceeds traceable to a violation of the wire fraud statute under 18 U.S.C. § 981(a)(1)(C). The

3    evidence shows that Boyer received valuable AML Bitcoin Tokens in exchange for his payment,

4    and so the proceeds from his payments could not be proceeds of wire fraud. Boyer sold all his

5    AML Bitcoin Tokens to Dillman in or around December 2018, about 2.56 million, for a total price

6    of about $2.99 million according the lawsuit filed by Boyer. Boyer now has a default judgment

7    against J.D. for the $2.99 million he was never paid plus interests and costs, a total of about $3.08

8    million. Andrade Decl., Ex. 23. Boyer received value for his AML Bitcoin Tokens, and so was not

9    a victim of any of the alleged fraudulent acts in the Complaint. He may have been a victim of

10   Dillman's fraud in December 2018, but nothing in the Complaint alleges that Andrade or his

11   property were involved in that fraud. The government cannot confiscate Andrade's property based

12   on J.D./Dillman's defrauding of VICTIM ONE/Boyer in connection with an AML Bitcoin Token

13   transaction downstream of Boyer's purchase of legitimate AML Bitcoin Tokens in January 2018.

14   **D.     The government should be sanctioned, and the appropriate sanction is dismissal with prejudice, enjoining the government from filing additional actions against Andrade**

15   **without leave of court, and an appropriate monetary award.**

16   As explained above, all the evidence in the record shows that AML Bitcoin is a legitimate

17   business, that AML Bitcoin was not involved in any scheme to defraud VICTIM ONE or anyone

18   else, and that the only way in which VICTIM ONE may have been a victim was in relation to his

19   December 2018 transaction with J.D. for which he has already obtained a default judgment.

20   The government knew all this information, and still filed its Complaint seeking forfeiture

21   of Andrade's personal residence in the middle of the COVID19 pandemic. Nothing in the

22   Complaint explains why the government waited until March 12, 2020, over two years, to attempt

23   to seek civil forfeiture. All the alleged events in the Complaint took place between January 12,

24   2018, when VICTIM ONE purchased his AML Bitcoin Tokens, and May 10, 2018, when Andrade

25   purchased *his* home. Complaint at ¶¶ 10-15. The government knew all the relevant facts, knew it

26   had no case, but still waited until the moment it could most damage Andrade—in the middle of a

27   national panic, right as the full-featured AML Bitcoin was about to launch. Additionally the

28   government seized Andrade financial accounts and more on another sworn affidavit, telling the

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL
RULE OF CIVIL PROCEDURE 11(C)

1   U.S Magistrate in Texas that the entire AML Bitcoin project was a fraud to justify freezing up to

2   millions of dollars. Andrade Decl., Ex. 31.

3        The government has no excuse for its factual inaccuracies. All the information regarding

4   the development of Andrade's cryptocurrencies—the launch of Aten Coin, the ICO of AML

5   Bitcoin Tokens, and the public's participation in the testing in 2019 up to April of 2020 until the

6   full-featured AML Bitcoin launched—is publicly available at the AML Bitcoin website and

7   NAC's YouTube page. The terms and conditions for AML Bitcoin Token sales that tell purchasers

8   exactly what they are purchasing are publicly available on the AML Bitcoin website. The

9   government was provided with over 80,000 documents in response to a subpoena, which caused

10  Andrade to incur over $300,000 in attorney's fees. Andrade Decl. at ¶ 17. The Boyer-Dillman

11  lawsuit was a matter of public record in the Superior Court of California, County of San

12  Francisco, and nevertheless the government would have learned of the lawsuit through Boyer and

13  Dillman who presumably are cooperating. VICTIM ONE/Boyer has admitted that he had been in

14  contact with the government on multiple occasions. No reasonable inquiry under the

15  circumstances could have allowed the government to proceed with the Complaint it has filed here.

16       The appropriate sanction is dismissal with prejudice, together with an order enjoining

17  further criminal or civil action against Andrade without leave of court, and at the absolute

18  minimum some amount of monetary sanction to compensate Andrade for having to defend against

19  this frivolous forfeiture action.. "Rule 11 sanctions are designed to deter, not compensate." *Willis*

20  *v. City of Oakland*, 231 F.R.D. 597, 600 (N.D. Cal. 2005). While being forced to pay for the costs

21  of fighting this frivolous complaint is part of an appropriate sanction, *see id.*, the government as

22  plaintiff will not be deterred by having to pay a few thousand, or even a few hundred thousand

23  dollars. Dismissal with prejudice would protect this property, but it would still allow the

24  government to bring other frivolous civil or criminal charges, or apply for frivolous search and

25  seizure warrants, in retaliation. The Court should therefore fashion an additional sanction,

26  admittedly fairly unique to this case, of exercising oversight over any further civil or criminal

27  investigation into Andrade or AML Bitcoin to prevent the government from damaging Andrade by

28  further abuses of process or malicious prosecution.

**CONCLUSION**

The government has no factual or legal basis to file its Complaint. It knows, or should have known, that the AML Bitcoin is a legitimate business based on patented technology. The government knows that "VICTIM ONE," Benjamin Boyer, was actually only a victim of "JD's"/ Dillman's breach of the contract between them in December 2018, and not a victim of anything done by Andrade or his company. The government should be sanctioned for filing its baseless and retaliatory complaint, and the most appropriate sanction would require the government to seek leave of court before taking any further civil or criminal action against Andrade or his company.

Andrade therefore respectfully requests that the Court grant his motion for sanctions under Fed. R. Civ. P. 11, and enter an appropriate order dismissing the complaint with prejudice, awarding Andrade appropriate monetary sanctions, and enjoining the government from filing other search or seizure warrants, civil complaints, or criminal charges without leave of court.

Dated:  July 8, 2020                              Respectfully submitted,

By:       /s *Manuel A. Medrano*
                                            MANUEL A. MEDRANO (SBN 102802)
                                               *mmedrano@zuberlawler.com*
                                            **ZUBER LAWLER & DEL DUCA LLP**
                                            350 S. Grand Ave., 32nd Floor
                                            Los Angeles, California 90071
                                            Telephone: (213) 596-5620
                                            Facsimile: (213) 596-5621

                                            BRIAN J. BECK (*pro hac vice*, IL BN 6310979)
                                               *bbeck@zuberlawler.com*
                                            **ZUBER LAWLER & DEL DUCA LLP**
                                            135 S. LaSalle St., Suite 4250
                                            Chicago, Illinois 60603
                                            Telephone: (312) 346-1100
                                            Facsimile: (213) 596-5621

                                            *Attorneys for Claimant*
                                            *Rowland Marcus Andrade*

NOTICE OF MOTION AND MOTION OF ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 11(C)