ROWLAND MARCUS ANDRADE
9414 Plaza Point Drive
Missouri City, Texas 77459   USA

In Pro Se

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ONE PARCEL OF REAL PROPERTY LOCATED AT 9414 PLAZA POINT DRIVE, MISSOURI CITY, TEXAS 77459,<br><br>    Defendant.<br><br>ROWLAND MARCUS ANDRADE,<br><br>    Claimant.<br><br>SOLMAZ ANDRADE,<br><br>    Claimant.<br><br>WILMINGTON SAVINGS FUND SOCIETY, FSB as trustee for IRP FUND II TRUST 2A,<br><br>    Claimant. | Case No. 3:20-cv-2013-VC<br><br>**DECLARATION OF ROWLAND MARCUS ANDRADE IN SUPPORT OF NOTICE OF MOTION AND MOTION OF ROWLAND MARCUS ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 11(C)**<br><br>*Filed concurrently with NOTICE OF MOTION AND MOTION OF ROWLAND MARCUS ANDRADE FOR SANCTIONS AND DISMISSAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 11(C); MEMORANDUM OF POINTS AND AUTHORITIES; AND [PROPOSED] ORDER*<br><br>Judge:   Hon. Vince Chhabria<br><br>Trial Date:           None Set<br><br>Hearing Date: August 13, 2020, 10:00 a.m. |

# DECLARATION OF ROWLAND MARCUS ANDRADE

I, Rowland Marcus Andrade, declare as follows:

1. I am a party in the above-entitled action. I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein.

**A.** **Development of the AML Bitcoin Technology.**

2. I began developing cryptocurrency with anti-money-laundering ("AML") security features in 2012, and formed the company NAC Foundation, LLC ("NAC") in 2014.

3. My technological innovations primarily involved cryptocurrencies with biometric identity verification features to prevent anonymous accounts from being used to launder money or to use cryptocurrency for other illegal purposes.

4. Using my technology, I developed the Aten Coin, a digital currency designed to be compliant with anti-money-laundering and anti-terrorist regulations and to be theft-resistant. NAC officially launched the Aten Coin publicly on September 21, 2015, selling about nine million Aten Coins.

5. I have filed applications for patents on my technology in many countries, the first of which was a European patent application filed on March 3, 2015. I have since received a notice of allowance for it. It covers knowing the true identities of senders and receivers of digital currency transactions while using a multi-signature (two credential) wallet, this alone is an extremely valuable patent. I have since obtained seven United States Patents on various biometric related technologies, U.S. Patents Nos. 9,985,964, 10,116,657, 10,182,051, 10,298,571, 10,298,572, 10,389,713, and 10,484,178, with other applications still pending in the U.S., along with many related issued patents and pending patent applications in other countries. The earliest U.S. Patent has a priority date in March 2016. As of today, I have over 40 total approved patents and well over 100 pending patent applications.

6. Each of my patents is licensed to NAC for use in NAC's AML Bitcoin cryptocurrency. On information and belief, the government has a copy of the licensing agreement between my patent holding company and NAC.

7. NAC had contracts with several ID verification companies for use of their technology while our own ID Verification company was in development, such as Jumio Corp. A true and correct copy of NAC's contract with Jumio is attached hereto as Exhibit 1.

8. NAC also has contracts with several companies to provide transaction monitoring for suspicious activity; these companies include among others Global Vision Systems, Inc., and Comply Advantage. True and correct copies of contracts between NAC on the one hand, and Global Vision Systems and Comply Advantage on the other, are attached hereto as Exhibits 2 and 3, respectively. Global Vision Systems was a recommendation from the American Banking Association. NAC even served as a Platinum Member of the American Bankers Association.

9. Alongside these third-party transaction monitoring solutions, NAC developed its own internal transaction monitoring system called DetectM, and finalized its own ID verification system called the VIN system. These systems are now operational as part of AML Bitcoin.

10. In advance of an initial coin offering ("ICO") of AML Bitcoin Tokens in October 2017, NAC released a white paper explaining in detail the technology and business plan behind AML Bitcoin, and its improvements over the predecessor Aten Coin. A true and correct copy of that white paper, which is publicly available from the NAC website at https://amlbitcoin.com/white-paper/, is attached hereto as Exhibit 4. Since then, there is an updated white paper that has not been released to the public yet since I have been very busy drafting and submitting various court filings as a response to this compliance.

11. AML Bitcoin Tokens were a cryptocurrency designed as a placeholder for the planned AML Bitcoin that lacked the biometric security features intended for AML Bitcoin. They were created to allow customers to begin using NAC's cryptocurrency products while AML Bitcoin was in development. A "Frequently Asked Questions" page available on the NAC website at https://amlbitcoin.com/faq/ explains the difference between AML Bitcoin Tokens and AML Bitcoin. A true and correct copy of that web page is attached hereto as Exhibit 5.

DECLARATION OF ROWLAND MARCUS ANDRADE

DOJ REFORM

12. As part of the October 2017 ICO, NAC issued millions of AML Bitcoin Tokens between October 2017 and February 2018, at prices of around $1.00 to $1.50 per AML Bitcoin Token.

13. During the development cycle for AML Bitcoin, I received assurances from public cryptocurrency exchange HitBTC in November of 2017 that AML Bitcoin Tokens would be listed on their exchange in a few months, but that listing got delayed due to concerns about general United States cryptocurrency regulations outside my control. True and correct copies of my receipt for payment to HitBTC and accompanying emails regarding listing of AML Bitcoin tokens by HitBTC are attached hereto as Exhibit 6.

14. True and correct copies of a press release issued on December 15, 2017 indicating that AML Bitcoin Tokens would be soon listed by HitBTC, and a press release issued on August 13, 2018, stating that AML Bitcoin Tokens had been listed by HitBTC, are attached hereto as Exhibit 7 and 8 respectively.

15. I continued developing AML Bitcoin related technology throughout 2018 and 2019, making steady progress. I never told anyone in January 2018 that we were months away from launching AML Bitcoin; I did tell people we were months away from testing AML Bitcoin, which we were. However, as explained below, government interference delayed the ultimate launch of AML Bitcoin.

16. The government, through FBI Agent Rohan Wynar, was aware in 2018 through a recorded call with Richard Naimer, about the ID Verification System that NAC was funding. The government should have learned through that call that NAC was spending a few hundred thousand dollars each month in expenses towards developing this software.

17. Afterwards, the government began harassing AML Bitcoin supporters and financial backers of the project, alleging that AML Bitcoin was a scam and attempting to find someone who would support their allegations of fraud. As a result of their harassment, NAC incurred substantial attorney fees, expenses, and debts—over $2 million total—and NAC employees quit in fear of the criminal investigation. We had to produce over 80,000 documents and spend over $300,000 in attorney fees and expenses just to respond to one government subpoena. One of our major

developers, Hung Tran, quit the project after two years because the government investigation scared him into quitting. A true and correct copy of an email from Tran regarding the FBI's inquiry in October 2018 is attached hereto as Exhibit 9.

18. Despite the government's interference, NAC's public YouTube channel documents the improvements made in 2018-19. In June 2018, AML Bitcoin Tokens were listed on several public digital currency exchanges, and a series of videos on the YouTube channel explains how to use each of those exchanges to trade AML Bitcoin. A list of these videos is available at www.amlbitcoinvideos.com.

19. NAC began public beta testing of the full-featured AML Bitcoin product in November 2019. Information regarding how to operate the AML Bitcoin during the beta test was publicly available through NAC's public YouTube channel, posted on November 26, 2019, at https://www.youtube.com/watch?v=ztwyqpmlSzU. One of the videos uploaded on November 26, 2019, titled "How to Verify Your Identity with the Virtual Identity Network (VIN) System Through AMLWallet.com," discusses how to use the identity verification system unique to AML Bitcoin.

20. Also on the NAC public YouTube channel, a video titled "Aten Black Gold Coin System Functionality—AML BitCoin's Pioneer Coin" includes proof that the Aten Coin technology was completed as of August 16, 2015.

21. On April 12, 2020, AML Bitcoin launched with its intended biometric security features, and AML Bitcoin Token holders were able to exchange their tokens for AML Bitcoins on a 1:1 exchange basis. AML Bitcoins are now listed on LBank Exchange, as explained at https://twitter.com/LBank_Exchange/status/1270607048628002816.

**B.     J.D. and VICTIM ONE's Involvement in AML Bitcoin**

22. In 2017, I had a brief business relationship with an individual named Japheth Dillman, whom I believe to be the "J.D." identified in the Complaint. Dillman was introduced to me by famous lobbyist and convicted felon Jack Abramoff, who came to me offering to help develop AML Bitcoin partnerships with government officials he knew through his lobbying activities.

23. As part of his assistance, Abramoff encouraged me to hire Dillman, one of his associates, as a "Chief Strategy Officer." NAC proceeded to hire Dillman as its Chief Strategy Officer in a letter dated September 24, 2017. Dillman's duties were not to sell AML Bitcoin Tokens, but to generate publicity and marketing strategies including a developing partnership with the Port of San Francisco, foreign governments, and Silicon Valley tech companies. A true and correct copy of Dillman's employment agreement with NAC is attached hereto as Exhibit 10.

24. Dillman never performed the duties required of him as Chief Strategy Officer, and I ultimately terminated his involvement with the project in December 2018.

25. In January 2018, a company named Block Bits Capital, LLC ("Block Bits Capital") owned by Dillman, Abramoff, and their associates, purchased AML Bitcoin Tokens directly from NAC as part of the initial sale (i.e., the ICO) of AML Bitcoin Tokens. Invoices showing purchases of AML Bitcoin Tokens by Block Bits Capital were previously attached to the Answer (Dkt. No. 18) as Exhibit L, and are attached hereto as Exhibit 11.

26. Dillman informed me on January 14, 2018, that Block Bits Capital intended to put in an order for $50 million of AML BitCoin, and was sending an initial wire of $850,000 as part of that purchase. I never knew that VICTIM ONE—whom I believe to be an individual named Benjamin Boyer—provided the funds for Block Bits Capital's purchases until much later. I never spoke with VICTIM ONE/Boyer in January 2018 when these AML Bitcoin Token purchases were made. Dillman's email to me regarding the purchase states that Block Bits is the purchaser and never mentions VICTIM ONE/Boyer. A true and correct copy of that email from Dillman is attached hereto as Exhibit 12.

27. When any purchase of AML Bitcoin Tokens was made—and thousands of transactions were made during the ICO, including the purchases by Block Bits Capital—the money went into the "DSA account" identified by the Complaint. That account is named "David Salmon & Associates, Inc. Client Trust Account for NAC Foundation;" it is an attorney-client trust account that was used to hold money in escrow pending the token holders receiving the AML Bitcoin Tokens they had paid for. Only the attorney, David Salmon, had the authority to transfer funds out of the DSA account, and he would only do so after NSA's accountant confirmed that the

purchasers had received their Tokens. A true and correct copy of a letter sent on January 25, 2018, from NAC's accountant Karl Ruzicka to Salman authorizing distribution of funds from the DSA account is attached hereto as Exhibit 13.

28.    After purchasing over $1.4 million in AML Bitcoin Tokens through Block Bits Capital, Dillman informed me that Block Bits Capital was unable to raise and invest the remainder of the intended $50 million. A true and correct copy of the April 4, 2018 letter from Dillman advising that Block Bits Capital would not proceed with its purchase is attached hereto as Exhibit 14. Again, the letter does not mention or reference VICTIM ONE/Boyer in any way.

29.    In April 2018, Dillman invited me to join Block Bits Capital because he and his partners believed in the longevity of my digital currency. A true and correct copy of an email Dillman sent to me on April 2, 2018, asking me to invest in Block Bits Capital, is attached hereto as Exhibit 15. I never became a member of Block Bits Capital, however, and the government should know that from its communications with Dillman and Boyer.

30.    Distribution statements I obtained later from Boyer indicate that the transactions referred to in the Complaint were payments from Boyer to Block Bits, not to NAC. A true and correct copy of those distribution statements, which match the dollar amounts and dates of the transactions listed in the Complaint, were attached to the Answer (Dkt. No. 18) previously as Exhibit L, and are attached hereto as Exhibit 16. The correspondence between these transactions and the Complaint is the basis for my belief that "VICTIM ONE" is Boyer.

31.    I did not learn of Boyer's involvement until October 2018, when a related Block Bits company, Block Bits AML Holdings ("Block Bits Holdings"), brokered the purchase of AML Bitcoin Tokens through a purchase agreement in which Boyer and I never spoke. A true and correct copy of the purchase agreement for those transactions is attached hereto as Exhibit 17.

32.    I did not make any representations of any kind to Boyer regarding either the January 2018 or the October 2018 purchases because I never spoke to him at that time.

33.    Around late November 2018, I found out that Dillman and his partner David Mata were allegedly making misrepresentations to people when brokering the sale of AML Bitcoin Tokens. When I learned of this issue in late 2018, NAC's compliance attorney Chris Ray reached

1  out to Boyer and Dillman and Mata. Ray sent Boyer an email asking him to contact Ray. My staff
2  then followed up on that email to inform Boyer that Ray's job was to ensure that all the
3  information he received from his client was true and accurate. A true and correct copy of those
4  emails is attached hereto as Exhibit 18.

5     34.    Shortly thereafter, Mata, now representing himself as the Managing Director of
6  Block Bits Capital, informed me that Boyer had already sold his AML Bitcoin Tokens to Dillman,
7  and so would likely not respond to me or Ray. A true and correct copy of an affidavit from Chris
8  Ray regarding these events is attached hereto as Exhibit 19.

9     35.    As a result of the information I had learned from Mata and Ray indicating that
10 Mata and Dillman may have made false representations to Boyer, I tried to get ahold of Boyer to
11 offer him a full refund of his direct purchases in December 2018 and January 2019, and informed
12 Mata and Dillman that I would no longer do any business with Block Bits. A true and correct copy
13 of my January 10, 2019 email to Mata and Dillman is attached hereto as Exhibit 20. Neither Mata,
14 Dillman, nor Boyer responded to that email for months.

15     36.    On June 9, 2019, Boyer revealed to me that he had an agreement between himself
16 and Dillman involving Block Bits Holdings. Boyer and Dillman created Block Bits Holdings by
17 an agreement effective January 11, 2018. A true and correct copy of the Company Agreement of
18 Block Bits AML Holdings LLC, which was previously attached to the Answer (Dkt. No. 18) as
19 Exhibit P, is attached hereto as Exhibit 21.

20     37.    Boyer told me in July 2019 that months earlier, in late 2018, the government had
21 told him that AML Bitcoin was a scam. A true and correct copy of Boyer's July 10, 2019, email to
22 me indicating that the FBI told him that AML Bitcoin was a fraud is attached hereto as Exhibit 22.

23     38.    Apparently, when the government told Boyer that AML Bitcoin was a fraud in late
24 2018, instead of contacting me directly, Boyer contacted Dillman and fellow Block Bits AML
25 Holdings member David Mata.

26     39.    Dillman then entered into an agreement with Boyer to buy him out without my
27 knowledge. According to their agreement, the buyout was supposed to happen on January 9, 2019.
28

40. However, Dillman and Boyer had an apparent falling out. Dillman had agreed to purchase the AML Bitcoin Tokens in Block Bits Holdings' possession for about $3 million. Boyer transferred the tokens to Dillman, but Dillman never paid Boyer any of the promised money for the tokens. Boyer accordingly filed a lawsuit against Dillman for breach of contract in the Superior Court of California for the County of San Francisco on April 10, 2019, Case No. CGC-19-575158. A true and correct copy of the complaint Boyer filed in that case is attached hereto as Exhibit 23.

41. Dillman never responded to that complaint, and Boyer obtained a default judgment against Dillman for $3,103,674.63 on June 19, 2019. A true and correct copy of the docket for Case No. CGC-19-575158, showing the default judgment entered for Boyer against Dillman, is attached hereto as Exhibit 24.

42. In May 2019, after Boyer filed his lawsuit against Dillman but before he obtained his default judgment, Boyer responded to me to say that Dillman had instructed him in November/December 2018 not to talk to me or anyone from NAC. A true and correct copy of that email, dated May 30, 2019, is attached hereto as Exhibit 25.

43. Until Boyer told me of his lawsuit against Dillman, I had no knowledge of the transactions that had occurred between Boyer, Dillman, and Mata, or of Boyer's lawsuit against Dillman.

**C.     Jack Abramoff's Extortionate Scheme**

44. While Dillman and Boyer were making their purchases and deals, I was becoming concerned about Jack Abramoff and Dillman's other activities. Around March or April of 2018, Dillman contacted me and told me he could get the $50 million AML Bitcoin Token purchase deal back, but only if he were compensated for his time. Specifically, Dillman asked me to pay him a percentage of what Block Bits Capital purchased in AML Bitcoin Tokens.

45. I refused Dillman's offer, but Dillman then sent several invoices to me and my CPA from a different company name I had never seen before named Janga. I still refused these payments.

46. Abramoff then contacted me and told me that Dillman was going to set up a meeting between me and the Port of San Francisco commissioner Leslie Katz, and California's

Lieutenant Governor Gavin Newsom. That event occurred on April 26, 2018. A true and correct copy of an email from Katz, attaching a picture of me and Lieutenant Governor Newsom from the event, is attached hereto as Exhibit 26.

47. Abramoff and Dillman informed me then that a deal was in progress with the Port of San Francisco. Abramoff insisted, however, that unless I pay Dillman the money he requested, that nothing would be done with the governor or the Port.

48. I was also informed that the State of California wanted to use our technology to assist in taxing marijuana, which had been legalized by the State of California for recreational use starting January 1, 2018, but remained illegal under federal law. The State of California needed the AML Bitcoin technology because due to the differing legal status of marijuana under state and federal law, the federal government could crack down on FDC-supported banks handling marijuana-related transactions.

49. The meeting with the Port of San Francisco occurred on April 27, 2018. A true and correct copy of emails relating to that meeting and a Powerpoint Presentation given at that meeting is attached hereto as Exhibit 27.

50. On April 28, 2018, I had another conversation with Abramoff, in which he persuaded me to pay Dillman or I would lose the deal with the Port of San Francisco, other ports, and the State of California. I paid Dillman 450 ethereum (another cryptocurrency), with an approximate total market value of $300,000, knowing that he had just put me in front of the soon to be elected Governor of California.

51. David Mata called me weeks later and nervously told me that he also personally wanted a percentage of what Block Bits Capital brought in. I told him I had already paid it.

52. Around December 2018, my relationship with Jack Abramoff began to deteriorate, as none of his promised contacts had resulted in any deals. Things became worse when I loaned Richard Naimer, another close associate of Abramoff, over $700,000 in fall 2018 in consideration for shares in Naimer's company, DIT Network. Naimer refused to pay me back or to give me shares in the company. A true and correct copy of an engagement letter between Naimer and an

attorney he hired to prepare the loan agreement between DIT and NAC is attached hereto as Exhibit 28.

53. By January 2019, when DIT and Naimer had refused to pay back any of the loan or to give NAC the shares, I ceased doing business with DIT and Naimer. A true and correct copy of an email I sent to Naimer's attorney on January 22, 2019, regarding DIT's failure to pay back the loan, is attached hereto as Exhibit 29.

54. Abramoff and Naimer then demanded that I sign over the rights to my technology in order for me to receive the shares in DIT I was already entitled to. In January 2019, I was woken up around 5 a.m. with a call from Naimer, and he told me that the agreement had to be signed and sent back at that very moment. A true and correct copy of the Patent License Agreement Naimer demanded I sign, and my emails regarding his demands sent on January 20, 2019, are attached hereto as Exhibit 30.

55. As set forth in the Motion to Preserve Evidence I filed on June 10, 2020, Abramoff followed up this event with threats that if I did not sign a deal to sell my business and intellectual property for $100 million, of which Abramoff would personally receive $40 million, my business would be destroyed. The emails sent from his associate David Cohen on August 20, 2018, and on August 28, 2018, both threatened that if I did not agree to the deal, I would face civil asset forfeiture proceedings such as the present case that would destroy my business. Dkt. No. 31 at 4-5.

56. The government has also seized up to millions of dollars in my accounts as part of the same scheme through a seizure warrant executed on March 12, 2020, even though it has not included those funds in this civil forfeiture complaint or filed any other civil or criminal forfeiture actions regarding those funds. The only part of the seizure warrant left behind was an attachment listing the funds to be seized. A true and correct copy of the attachment to the seizure warrant listing the funds seized is attached hereto as Exhibit 31.

1  I declare under penalty of perjury under the laws of the United States of America that the
2  foregoing is true and correct.
3
4  Executed on this 12th day of June, 2020, at Missouri City, Texas.
5
6  *R. Marcus Andrade*
   Rowland Marcus Andrade

DOJ REFORM